780 F.2d 1082
 1986 A.M.C. 1539
 LURIA BROTHERS & COMPANY, INC., Ogden Metals Inc., Ogden
Corporation and Luria International Division,
Plaintiffs-Appellants, Cross-Appellees,
v.
ALLIANCE ASSURANCE CO., LTD., Commercial Union Assurance
Co., Assmij Nieuw Rotter Dam, Eagle Star Insurance Company,
Londo & Hull Maritime Insurance Company, Urbaine UAP,
Assicur-Azioni D'Italia, La Belgique S.A., Assurances
Abelle-Paix, Mutuamar-Societa De Ass. Per Azioni, Levante,
Comar, Siat (Societa Italiana Assicuracioni Trasporti),
Riunione Adriatica, Sicurta Fra Armatori, Tokio Fire &
Marine Ins. Co., Ltd., Taisho Marine & Fire Ins. Co., Ltd.,
Neuchateloise Compagne Suisse, Europa, Assurances Generales
de France, L'Assurances Liegeoise, Boreas, Pacific Employers
Insurance Co., American International Underwriters, Italia
Assicurazioni Kemper, Languedoc Societe d'Assurancas,
Cornhill Insurance Co., Ltd., Scottish Lion Ins. Co., Ltd.,
De Vaderlandsche, Phoenix Continental S.A., L'Alsacienne,
Block Sea & Baltic General Ins. Co., Ltd., Le Monde,
S.A.A.G. 1857 Bruxelles, Riunione Adriatica, L'Independance,
Providentia, Atlas, Allianz, and any and all underwriters
subscribing to Marine Liability Policy numbered 3110 and
Mari Excess Liability Policy numbered 3111, City Insurance
Company, Defendants-Appellees, Cross-Appellants.
 Nos. 1133, 1187, Dockets 85-7002, 85-7004 and 85-7028.
 United States Court of Appeals,
Second Circuit.
 Argued April 29, 1985.
Decided Jan. 10, 1986.
 
 Patrick V. Martin, New York City (Douglas R. Burnett, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, of counsel) for plaintiffs-appellants, cross-appellees.
 Richard E. Repetto, New York City (John A.V. Nicoletti, James P. Krauzlis, Donovan Maloof Walsh & Kennedy, New York City, of counsel), for defendants-appellees, cross-appellants.
 Before VAN GRAAFEILAND and PRATT, Circuit Judges, and MORRIS E. LASKER, Senior District Judge for the Southern District of New York, sitting by designation.
 GEORGE C. PRATT, Circuit Judge.
 
 
 1
 This case arises out of the sinking of a cargo ship on the high seas with the loss of all crew members and passengers. The issues, of course, are over money: to what extent shall plaintiffs Luria Brothers & Company, Inc., et al., hereinafter collectively referred to as "Luria", who were charterers of the ill-fated vessel, recover from defendants Alliance Assurance Co., Ltd. et al., hereinafter collectively referred to as "underwriters", for financial burdens resulting from the loss and the events leading up to it. Luria, having settled with the cargo owners and the personal representatives of those who lost their lives in the sinking, sought in the court below indemnity from the underwriters for the settlement payments made and for attorneys fees incurred in the settled cases. The underwriters denied any obligation to Luria.
 
 
 2
 The district court, after a nonjury trial, found Luria to be entitled to the claimed indemnity. But, for reasons soon to be explained, it also sua sponte ordered restitution to the underwriters of a $900,000 ex gratia payment they had earlier made to Luria.
 
 
 3
 Luria appeals from the order of restitution. The underwriters cross-appeal from the award to plaintiffs of indemnity and legal fees.
 
 BACKGROUND
 
 4
 Luria, an international dealer in scrap metal, regularly charters vessels to export the scrap. In connection with its export business, Luria purchased various insurance policies to cover its liability as a charterer and loading stevedore ("liability policies") as well as possible loss or damage to its cargo ("cargo policies"). Frank B. Hall & Co. of New York, Inc., ("Hall"), a New York insurance broker, placed and serviced these policies for Luria through Luria's Belgian broker, Henrijean & Cie of Brussels ("Henrijean").
 
 
 5
 Three insurance policies are relevant here: the primary liability policy, H/L 3110, the first excess liability policy, H/L 3111, and the cargo policy, H/L 3222. J. Haenecour & Co. of Brussels and Antwerp ("Haenecour") acted as underwriting agent and lead underwriter on behalf of the underwriters who subscribed to one or more of the three policies. As lead underwriter Haenecour was entrusted with authority to deal with all matters of rating, conditions, and settlement of claims in connection with the policies.
 
 
 6
 In July 1979 Luria entered into a time charter with Evimeria Compania Naviera, S.A., Panama, ("shipowner"), owner of a 17-year-old bulk carrier, Agios Giorgis. Under the terms of the charter party, Luria could employ the vessel to carry "[s]crap, excluding motor blocks and including turnings which, if loaded shall be chemically treated."
 
 
 7
 On August 22, 1979, the Agios Giorgis commenced loading 14,586 long tons of Luria's metal turnings at the port of Chicago. Luria admits that the cargo was loaded against the advice of its loading inspector, without being chemically treated, and that the vessel sailed with the turnings temperature in excess of permitted regulations. Further, Luria concedes that this resulted in breach of certain warranties in the cargo and liability policies that rendered coverage on those policies null and void for the voyage from Chicago to Newark, New Jersey.
 
 
 8
 On September 17, 1979, the vessel arrived at New Haven, Connecticut, to load additional scrap cargo on top of the turnings. The next day a fire was discovered in the turnings in the No. 5 hold of the vessel. Since the port of New Haven is devoted primarily to the discharge and storage of petroleum products, the harbor master ordered the burning Agios Giorgis to leave New Haven to avert potential disaster. She did so, and arrived at Luria's terminal at port Newark, New Jersey, on September 22. In these few days, the fire had spread throughout all of the vessel's holds, and despite attempts to extinguish the fire, temperatures eventually reached in excess of 1100 degrees fahrenheit.
 
 
 9
 After discussions among Luria, the shipowner, and other parties, it was decided to discharge all the turnings and scrap, an operation that was completed on November 9, 1979.
 
 
 10
 While the discharge was proceeding, representatives of Luria, Hall, Henrijean, and Haenecour met in Belgium in October. All present conceded that in view of the breach of warranties, the policies did not cover Luria's liability for loss and discharge of the cargo, for consequent delays, for damage to the vessel, or for possible third-party claims. Nevertheless, Luria requested from the underwriters an ex gratia payment--a voluntary contribution not required by the policies--to help Luria bear the loss.
 
 
 11
 In support of its request, Luria specifically dwelt upon the extensive business relationship between the parties over the past twenty years and suggested that it could direct additional future insurance business at profitable rates to the underwriters, if Haenecour would make the requested ex gratia payment. Although no agreement to make such a payment was reached at the October meeting, Haenecour told Luria to come back with a business proposition at a future meeting.
 
 
 12
 After discharge of the cargo and cleanup of the vessel, Luria decided to send the Agios Giorgis on a second voyage, this time to Japan with a cargo of heavy scrap from port Newark. Luria had a good reason to send the vessel to Japan since repairs for the damage caused by the fires, for which Luria was liable to the shipowner, could be had more cheaply in Japan.
 
 
 13
 Luria sought liability coverage for the voyage, and Henrijean negotiated a limited reinstatement of insurance with Haenecour on a new policy; on November 13, the reinstatement was made subject to "no aggravation of risk" by the proposed addendum to the charter party that would cover the second voyage.
 
 
 14
 Three days later, Luria and the shipowner formally agreed, by executing the addendum to the existing charter party, to employ the Agios Giorgis for the second scrap voyage to Japan. The shipowner warranted that "the vessel [was] in class ready to commence loading". Henrijean reviewed the addendum and forwarded it to the underwriters on November 26, 1979.
 
 
 15
 Loading of the scrap for the second voyage was completed on November 29, 1979, and the vessel set sail for Japan the following day. On board was a crew of 27, including the captain's wife, infant son, and three other members of his family. The vessel passed through the Panama Canal, bunkered at Los Angeles, and continued across the Pacific.
 
 
 16
 On January 7, 1980, the vessel M/S Nichirin Maru received an urgent distress call from the Agios Giorgis, reading in relevant part: "Indicate crack at hold No. 5 stop water under control stop * * * please attend master." The Nichirin Maru hastened to aid the vessel and sighted the Agios Giorgis the following day. The Agios Giorgis advised that she intended to continue her voyage under the escort of the Nichirin Maru, that she had sustained two large cracks in the plates at her No. 5 hold, that she was listing from four to five degrees, and that her pumps had the sea water coming through the cracks under control.
 
 
 17
 Several hours later, the Agios Giorgis sent a distress message indicating that one crack had enlarged to between four and five feet. But after the Nichirin Maru indicated the next day that it must soon abandon escort due to diminishing bunkers and supplies, the Agios Giorgis responded that conditions on the damaged vessel had stabilized and authorized the cessation of rescue efforts. The Nichirin Maru then altered her course and returned to Japan.
 
 
 18
 The following day, the vessel Hoegh Miranda received an emergency distress signal from the Agios Giorgis. As the Hoegh Miranda sped to assist, the Agios Giorgis informed her that water was rushing into two holds and that the vessel was beginning to list toward the right. At that time the winds were blowing up to full gale force, the sea was stormy, and the waves had reached a height of ten meters. A short time later, in the early hours of January 11, while within sight of the Hoegh Miranda, the Agios Giorgis sank, leaving no survivors.
 
 
 19
 About one month later, on February 7, 1980, with knowledge that the Agios Giorgis had sunk, representatives of Luria, Hall, Henrijean, and Haenecour met again in Belgium. Following that meeting representatives of Henrijean and Haenecour met alone and agreed to a final figure of $900,000 for the ex gratia payment to Luria. Their agreement was embodied in a telex summary of the meeting dated February 8, 1980, sent by Henrijean to Haenecour, who approved and confirmed the agreement in a telex also dated February 8. The first telex read, in pertinent part, as follows:
 
 
 20
 re: Luria--open cover 3222
 
 
 21
 hereunder agreement was reached on 7 February 1980 during meeting held in antwerp being understood that leader of cover is only engaging his own line and that we have to convince each and every co6underwriters [sic] to follow the same commercial approach. * * *
 
 
 22
 referring to * * * "aegis [sic] giorgis" (voyage chicago to port newark) the breach of warranties spelled out in open cover render coverage nul [sic] and void.
 
 
 23
 however, in view of long standing relationship, it was agreed, subject to here-above remark, to contribute into assureds losses within the scope of the open cover as follows:
 
 
 24
 1) cargo contribution--35 pct of dlrs 2 million or dlrs 700.000 less return premium.
 
 
 25
 2) charterers liability contribution: dlrs 200.000 less return premium
 
 
 26
 total contribution: dlrs 900.000 ot [sic] being understood that:
 
 
 27
 --there will be no supplementary contribution whatsoever out of all aegis [sic] giorgis * * * casualties resulting from the fires.
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 henrijean will develop best possible efforts to convince co-unds and/or reinsurers to follow same settlement and we hope toreport [sic] to you favorably as soon as possible.
 
 
 31
 The telex was forwarded to Hall, and then to Luria, which did not respond to Hall's invitation to state anything in the telex at variance with Luria's understanding.
 
 
 32
 In August 1981 Luria was served with a third-party complaint by the shipowner in an action brought on behalf of the underwriters for the sunken cargo. In September 1981 a wrongful death action seeking total damages of $9,400,000 against Luria and others was filed in the Southern District of New York on behalf of the estates and relatives of 22 of the 27 men, women, and children who had perished on the Agios Giorgis.
 
 
 33
 Luria sent the summonses and complaints in the death and cargo actions to Hall. By telex dated October 7, 1981, Hall informed Henrijean of the pendency of the actions and requested that he inform the underwriters and ask them to confirm appointment of counsel to "protect all interests".
 
 On October 14, Henrijean replied:
 
 34
 we refer to your telex of 7 October. we have informed the leading underwriters, who are declining liability in view of the agreement with the assured of 7 February 1980 * * *.
 
 
 35
 The cargo action was settled, and while Luria did not contribute to the settlement, it did incur pre-settlement legal expenses of $30,224.
 
 
 36
 In the wrongful death action the parties reached a final settlement in February 1983, to which Luria contributed $1,217,656.50. In return for its contribution, Luria received full releases from the death claimants and from the shipowner, as well as an indemnity from the shipowner's P & I Club for any future claims by the estates of the nonsuing decedents. Luria also incurred $59,485 in legal expenses in this action.
 
 
 37
 In May 1983 Luria brought the instant suit for indemnity against the underwriters who had subscribed to liability policies 3110 and 3111. Following trial, the district judge issued a 62-page "Findings and Conclusions and Order" in which he first addressed "the extent, if at all, to which Luria was under a legal liability to the death claimants with whom it settled". As discussed below in more detail, this question was central to Luria's suit for if Luria faced no potential liability from the death claimants, then the underwriters did not have to indemnify Luria for its contribution to the settlement. The court found that Luria was potentially liable to the death claimants, that the policies covered this type of liability, and that the underwriters, therefore, were required to indemnify Luria for the settlement.
 
 
 38
 The court then addressed whether Luria's claim was barred by the agreement under which the ex gratia payment was made. The underwriters argued that Luria's acceptance of the $900,000 ex gratia payment, pursuant to the provisions under which it was paid, precluded any indemnification for liability arising out of the sinking on the second voyage. However, the court reasoned that:
 
 
 39
 It is inconceivable that a businessman of Mr. Haenecour's sophistication would have agreed to a $900,000 ex gratia payment toward Luria's losses from the first voyage, if the question of the insurer's liability for potentially staggering indemnification on the second voyage remained an open one. Similarly, it is unlikely, and indeed impossible, that Luria would have consented to receive approximately 25% indemnity on its cargo losses for the first voyage, for which it, having breached the policy warranties, knew it was entitled to receive nothing, if it had been aware that by doing so, it would later be claimed to have released the insurers from any responsibility for indemnity against immense and undetermined third-party claims arising out of the sinking on the second voyage.
 
 
 40
 The effect and scope of the disputed provision in the February 8th telex presents a fundamental ambiguity. In the total absence of any persuasive evidence establishing that the parties enjoyed a shared understanding of this ambiguous clause, the Court is led to conclude, and I find, that no enforceable contract was created at the time of the February conference * * *. [footnote omitted].
 
 
 41
 The district court then found that since Luria "apparently" had not directed the additional promised business to the underwriters, a promise the court thought was composed of "precatory words * * * too vague * * * to constitute consideration for the ex gratia payment", Haenecour in effect had received no consideration for the payment, and its purposes for making the agreement were frustrated. Even though the underwriters had never requested return of the payment, the court concluded that "[e]quity requires that the underwriters be made whole by restoration of the amount of the ex gratia payment," deemed the pleadings amended on this point to conform to the proof, pursuant to Fed.R.Civ.P. 15, and offset the $900,000 ex gratia payment against the indemnity required of the insurers.
 
 
 42
 The court also awarded Luria reimbursement for legal expenses incurred in defense of the wrongful death and cargo actions.
 
 
 43
 Finally, the district court rejected the underwriters' claim that the amount of indemnity should be reduced by the value of an additional benefit Luria had received under the settlement between the shipowner and Luria--a release from its previously agreed-to liability to the shipowner for damage to the vessel caused by the turnings fire.
 
 
 44
 On appeal, Luria contends that: 1) the district court abused its discretion by sua sponte ordering restitution of the $900,000 to the underwriters, 2) the underwriters were not entitled to any restitution, 3) there was consideration for the $900,000 payment, and 4) the trial court erred in finding the February 7 agreement unenforceable.
 
 
 45
 On its cross-appeal, Alliance argues that the district court erred: 1) in failing to hold as a matter of law that the liability policies on the trans-Pacific voyage were void ab initio on account of Luria's failure to disclose facts material to the risk; 2) in finding coverage under the liability policies for the type of potential liability assigned to Luria; 3) in awarding Luria legal costs of defending claims arising out of the sinking; and 4) in not reducing the indemnity award by the amount of Luria's uninsured liabilities on the first voyage that were released by the shipowner in the settlement agreement. Finally, Alliance urges that if the district court erred in holding the February 7 agreement null and void, it further erred by failing to apply the agreement's terms and conditions which released the underwriters from the obligation to indemnify Luria.
 
 
 46
 We agree that the district court erred by ordering restitution, and we reverse that part of the judgment without prejudice to the bringing of another suit by Alliance or the other underwriters for restitution of the ex gratia payment. In view of this disposition, we need not address Luria's other claims. We reject each of the arguments raised by Alliance on its cross-appeal.
 
 DISCUSSION
 
 47
 A. Luria's Appeal.
 
 
 48
 Under Fed.R.Civ.P. 15(b), "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In such a case, failure to amend the pleadings to conform them to the evidence and raise these issues does not affect the result of the trial, Fed.R.Civ.P. 15(b), although the trial judge may allow such an amendment, even after judgment, either upon motion of any party, id., or sua sponte, 6 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1493, at 461 (1971).
 
 
 49
 Regardless of whether the pleadings are amended, however, the crucial test is whether the parties have consented to litigation of the issue; it must have been tried by their express or implied consent. Fed.R.Civ.P. 15(b); Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078, 1086 (2d Cir.1977).
 
 
 50
 Here, it is clear that the issue of restitution was not tried by the express consent of the parties. In essence, counsel for the underwriters urge otherwise by claiming that they had pled the February 7 agreement as an affirmative defense and that the court did no more than treat that affirmative defense as a counterclaim. The answer included in the appendix, however, contains no reference whatsoever to the February 7 agreement.
 
 
 51
 In any event, whether parties have implicitly consented to the trial of an issue not presented by the pleadings depends on whether they recognized that the issue had entered the case at trial. 6 C. Wright & A. Miller, supra, Sec. 1493, at 462. Usually, consent may be implied from failure to object at trial to the introduction of evidence relevant to the unpled issue. Usery v. Marquette Cement Manufacturing Co., 568 F.2d 902, 906 (2d Cir.1977).
 
 
 52
 Some evidence introduced at trial here arguably was relevant to the question whether there should be a rescission and restitution, e.g., the terms of the agreement and the different interpretations given the agreement by the parties. But, it would appear that the primary purpose for introducing the terms of the agreement and the parties' differing interpretations was to determine whether the underwriters had to indemnify Luria for its contribution to the settlement. That such evidence, relevant to both pled and unpled issues, was introduced without objection does not imply consent to trial of the unpled issues, absent some obvious attempt to raise them. McLean-Behm Steel Erectors, Inc. v. Occupational Safety and Health Review Commission, 608 F.2d 580, 582 (5th Cir.1979); see Browning Debenture Holders' Committee, 560 F.2d at 1086. And it is hard to find such an attempt when the questions of rescission and restitution were not even mentioned, let alone discussed below, until the district court issued its decision.
 
 
 53
 At a post-judgment, rule 52 hearing, the district court stated:
 
 
 54
 I told you time and again during this trial that it looked to me as if the $900,000 and the purposes for it were totally frustrated and you ought to address yourself to it. I am afraid on some of those occasions I did not tell you on the record but I am sure I mentioned it at least once and I know I told you a couple of other times.
 
 
 55
 After a careful review of the trial transcript, we have found no instance where the trial judge made such a comment on the record. Assuming he did so off the record, such a comment was insufficient to warn Luria that the trial judge was considering restitution of the payment, relief that the underwriter had not even requested. Under the circumstances, therefore, it is not fair to infer that Luria had consented to trial of the issue of restitution.
 
 
 56
 Moreover, we think that the district court's action prejudiced Luria. The underwriters who contributed to the $900,000 payment fall into three categories: 1) the defendant liability underwriters; 2) the nonparty cargo underwriters; and 3) the defendant liability underwriters, who also subscribed to the cargo policy. Luria argues that:
 
 
 57
 Each of the twelve non-party cargo underwriters had to specifically agree to its contribution to the ex gratia payment and did not act through the lead underwriter clause. * * * This was in sharp contrast to the issue of the declination of coverage by the party underwriters under the charterer liability policies 3110 and 3111. These underwriters acted through the lead underwriter. This distinction was fundamental in the formulation of pre-trial discovery by Luria. * * * Had Luria been apprised of the possibility of a recission of the ex gratia payment agreement, it would have certainly insisted upon depositions of the individual underwriters and discovery of their files.
 
 
 58
 Although we express no opinion as to the merits of Luria's argument, Luria should have been entitled, through normal pretrial discovery, to explore this and other possible defenses to restitution. The absence of any opportunity to do so constitutes sufficient prejudice to warrant reversal of that part of the district court's order granting restitution of the $900,000 payment. See International Harvester Credit Corp. v. East Coast Truck, 547 F.2d 888, 890-91 (5th Cir.1977) (improper to order rescission of contract under Rule 15(b) when rescission not raised in the pleadings or at trial); cf. Rosenwald v. Vornado, Inc., 70 F.R.D. 376, 377 (E.D.Pa.1976) (court denied post-trial motion to amend pleadings to add a counterclaim when matter was not admitted into evidence and plaintiffs did not have an opportunity to present a defense to the counterclaim).
 
 
 59
 We recognize the district judge's concern for a possible injustice if, indeed, the parties' intentions for the February 7 agreement were as he speculated. We therefore leave open the opportunity for the underwriters, some of whom were not formal parties to this action, to pursue the matter of restitution in a separate action.
 
 
 60
 B. Alliance's Cross-Appeal.
 
 
 61
 On its cross-appeal Alliance has asserted five major arguments, none of which is persuasive.
 
 
 62
 1. Luria's Nondisclosure of Material Facts. Alliance contends that the district court erred as a matter of law in failing to hold the liability policies void ab initio on account of Luria's failure to disclose facts material to the covered risk.
 
 
 63
 When first informed of the pendency of the cargo and the death actions against Luria, the underwriters did not raise a nondisclosure defense, but instead informed Luria that they "declin[ed] liability in view of the agreement with the assured of 7 February 1980." By failing to raise the nondisclosure defense until several years later, long after they originally had denied liability on another ground, the underwriters waived the defense. It is settled that "[w]hen one specific ground of forfeiture is urged against the claim, and a refusal to pay is based upon a specific ground, all other grounds are waived." 16C Appleman & Appleman, Insurance Law and Practice, Sec. 9260, at 393 (1981); see General Accident Insurance Group v. Cirucci, 46 N.Y.2d 862, 863-64, 414 N.Y.S.2d 512, 514, 387 N.E.2d 223, 224 (1979); Appell v. Liberty Mutual Insurance Co., 22 A.D.2d 906, 255 N.Y.S.2d 545, 547 (2d Dep't 1964); The Anthony D. Nichols, 49 F.2d 927, 930 (S.D.N.Y.1931).
 
 
 64
 The underwriters claim that they did not learn of the unseaworthy condition of the vessel until April 1983 and, since they had no knowledge in October 1981 of the facts giving rise to the nondisclosure defense, they insist that they could not have waived the nondisclosure defense by their original denial on other grounds at that time.
 
 
 65
 It is true that an insurer cannot waive a defense by asserting another defense as grounds for declination if it had no knowledge of the facts giving rise to the unasserted defense. See Ginsburg v. Pacific Mut. Life Ins. Co. of California, 89 F.2d 158, 160 (2d Cir.), cert. denied, 302 U.S. 708, 58 S.Ct. 27, 82 L.Ed. 546 (1937). But, at the time the underwriters here initially declined liability, they knew that the vessel had experienced severe fires in the holds with temperatures in excess of 1100 degrees fahrenheit, and had later sunk. They also had commissioned an earlier survey by the London Salvage Association, which indicated that there had been extensive damages to the vessel from the fire, and that repairs had been deferred until arrival in Japan.
 
 
 66
 Finally, their argument here is belied by their own action. The February 7 agreement provided, in part, that "there will be no supplementary contribution whatsoever out of all aegis [sic] giorgis * * * casualties resulting from the fires." [emphasis added]. This part of the agreement is what the underwriters must have had in mind when they declined liability in 1981, since the remainder of the agreement provides no possible basis for avoiding liability. It follows that when they declined liability, the underwriters must have though that the fire had weakened the vessel to the point of making it unseaworthy. It strains our credulity when they now argue that they didn't learn the ship was unseaworthy until 1983.
 
 
 67
 In any event, even if the underwriters did not have actual knowledge of the facts giving rise to the misrepresentation defense in 1981 when they declined liability on other grounds, the circumstances were more than adequate to put them on notice that Luria had not disclosed the unseaworthy condition of the vessel when it sought insurance for the second voyage. Hence, they had constructive knowledge and this alone was sufficient. 16C Appleman & Appleman, Insurance Law and Practice Sec. 9260, at 394 & n. 11 (1981); see Zeldman v. Mutual Life Insurance Co. of New York, 269 App.Div. 53, 53 N.Y.S.2d 792, 794 (1st Dep't 1945) (insurer normally does not waive rights unless acting with actual knowledge of the facts; constructive knowledge, however, may be sufficient if insurer disregards circumstances putting it on notice).
 
 
 68
 2. Coverage Under the Policy. The underwriters next argue that the district court erred in finding coverage under the liability policies for the type of potential liability it assigned to plaintiffs in finding indemnity for the settlement.
 
 
 69
 When an insurer declines coverage, as here, an insured may settle rather than proceed to trial to determine its legal liability. Bunge Corp. v. London and Overseas Insurance Co., 394 F.2d 496, 497, (2d Cir.), cert. denied, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968). In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled "so long as * * * a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured]." Damanti v. A/S Inger, 314 F.2d 395, 397 (2d Cir.) cert. denied, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963).
 
 
 70
 On the facts known to Luria at the time of settlement, Luria had potential liability to the death claimants. The district court found it probable that a trial jury would have concluded that the unseaworthiness of the vessel caused the sinking and that the earlier fire was a concurrent cause of the sinking. While it is generally true that "a time charterer assumes no liability flowing from the unseaworthiness of the vessel", Klishewich v. Mediterranean Agencies, Inc., 302 F.Supp. 712, 713 (E.D.N.Y.1969), a time charterer may be held liable for foreseeable damage to others resulting from loading and storage of cargo, see, e.g., In re Skibs A/S Jolund, 250 F.2d 777, 787 (2d Cir.1957), cert. denied, 356 U.S. 933, 78 S.Ct. 773, 2 L.Ed.2d 763 (1958). Here, even though Luria, as charterer, might ordinarily have owed no legal duty to the seamen for the unseaworthiness of the vessel, we detect no error in the finding below that a jury
 
 
 71
 might well have found that Luria's disregard of explicit standards for such cargo presented a foreseeable danger of combustion within the cargo of untreated turnings, with Luria under a duty of care to those who foreseeably might have been injured as a result of its negligence, see Petition of Kinsman Transit Company, 338 F.2d 708, 722 (2d Cir.1964), and thus obligated to ascertain that the damages caused by the fire had been repaired adequately before loading the vessel for departure on the second voyage.
 
 
 72
 Under the circumstances, where Luria, though a time charterer, actively participated in exposing third parties to an inherently dangerous condition that it helped create, the possibility for joint liability, along with the shipowner, for damage to these third parties was high. Thus, the district court amply demonstrated Luria's potential liability.
 
 
 73
 Further, one need only read the first section of both liability policies to determine that they encompassed this type of liability. Those sections read in pertinent part:
 
 
 74
 Charterers Liability.
 
 
 75
 This insurance to cover the liability whether legal or contractual of the Assureds insofar as they are interested in the shipment of ferrous and/or nonferrous scrap including turnings * * *.
 
 
 76
 Luria's potential liability for its failure "to ascertain that the damages caused by the fire had been repaired adequately before loading" the scrap for the second voyage, falls within the broad scope of Luria's insurance against liability "insofar as [it is] interested in the shipment of * * * scrap".
 
 
 77
 3. Payment of Legal Expenses by Alliance. The underwriters object to the award of legal fees to Luria, arguing that under the terms of the liability policies, payment of such expenses was contingent upon the underwriters' consent. The pertinent language of the policies provides that:
 
 
 78
 This insurance to cover the liability * * * of the Assureds * * * [i]ncluding * * * all legal expenses and/or costs incurred in defending claims whether founded or unfounded subject to the notification and acquiescence of the underwriters * * *.
 
 
 79
 * * *
 
 
 80
 * * *
 
 
 81
 Costs [excluding expenses for salaried employee and retainer counsel] incurred by the Assured shall be payable by the underwriters only if underwriters hereon give written consent to the incurring of such costs in respect of any particular claim, suit or proceeding * * *.
 
 
 82
 As a matter of common sense, once the underwriters had disclaimed all liability, Luria had no need thereafter to obtain their approval for legal expenditures. Since, as we have shown above, the underwriters were liable for indemnification, they were also liable for Luria's reasonable legal fees in defending and settling the underlying claims.
 
 
 83
 4. Reducing the Indemnity Award by the Amount of Luria's Released Uninsured Liabilities. The underwriters point out that the fires on the Chicago to Newark voyage had caused extensive damage to the vessel's hull, that by agreement with the shipowner, Luria was liable for the cost of repairs, and that Luria had no insurance coverage for this liability since the warranties of the insurance policies had been breached. They reason that this "uninsured contractual liability" of Luria was released in the overall settlement agreement to which the shipowner and Luria were parties, and they conclude that "[u]nderwriters cannot be required to indemnify Luria for the amounts expended to release itself from any uninsured liability" and that they should therefore be credited with the value Luria received as a result of the release of its uninsured liabilities to the shipowner.
 
 
 84
 At a post-trial hearing, the district court noted that since under admiralty law the shipowner's claim against Luria sank with the ship the release did not affect "the allocation of the settlement * * * between the owner and charterer at all, so I really think that there is no monetary value that can be assigned to that." Similarly, in the "Findings and Conclusions and Order" the court found that "[t]o attribute any monetary value to this release or indemnity, on the present record, would be speculative and unjustified." We find no error in the court's conclusion.
 
 
 85
 5. The Effect of the February 7 Agreement. The underwriters argue that if, as Luria contends in attacking restitution, the district court erred by holding the February agreement null and void, then it further erred by failing to apply those terms of that agreement that release the underwriters from the obligation to indemnify Luria. This argument fails, however, because the February 7 agreement, even if valid, would not have released the underwriters.
 
 
 86
 In making this argument, the underwriters rely on that part of the February 7 telex which stated that "there will be no supplementary contribution whatsoever out of all aegis [sic] giorgis * * * casualties resulting from the fires." This statement, however, must be read in the context of an earlier paragraph in the telex which began with the words "Referring to * * * Aegis [sic] Giorgis (voyage Chicago to Newark)", words which limit the impact of the agreement to the vessel's first voyage and have no effect on the later voyage across the Pacific.
 
 CONCLUSION
 
 87
 On Luria's appeal, that portion of the district court's order requiring restitution of the $900,000 payment is reversed without prejudice to another action by the underwriters for restitution. In all other respects the district court's order is affirmed.