873 F.Supp. 862 (1995)
In re BALFOUR MACLAINE INTERNATIONAL LTD., Debtor.
ATLANTIC MUTUAL INSURANCE COMPANY, Plaintiff,
v.
BALFOUR MACLAINE INTERNATIONAL LIMITED, Van Ekris & Stoett, Incorporated, Amro Bank, Bank Brussels Lambert, S.A., Banque Indosuez, BSI-Banca Della Svizzera Italiana, Defendants/Removants.
INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,
v.
ARMENIA COFFEE CORPORATION, Rafael Espinosa & Hnos., Bankers Trust Company, National Westminster Bank, American Express Bank Ltd., The Chase Manhattan Bank N.A., French American Bank Corp., Chemical Bank, First Fidelity Bank of New Jersey, Baii Banking Corp., PBTC International Bank and Credit Agricole CNCA, Defendants.
Nos. 92 Civ. 6417(LBS), 90 Civ. 8164(LBS).
United States District Court, S.D. New York.
January 23, 1995.
*863 *864 Donovan Parry Walsh & Repetto, New York City (John A. V. Nicoletti, David R. Hornig, James F. Sweeney, of counsel), for plaintiffs.
Varet Marcus & Fink, P.C., New York City (David P. Langlois, Stanley McDermott, of counsel), for defendants.

OPINION
SAND, District Judge.
There have been tried to the Court two declaratory judgment actions brought by insurers, Atlantic Mutual Insurance Company ("Atlantic") and Insurance Company of North America ("INA"), against two insured coffee traders, Van Ekris & Stoett, Inc. ("VES"), a wholly owned subsidiary of Balfour Maclaine International, Ltd., and Armenia Coffee Corporation ("Armenia") which they respectively insured.[1] Although the main controversy in the case, relating to the mysterious disappearance of substantial quantities of coffee from various Mexican warehouses, is substantially the same in both actions, certain defenses and claims are peculiar to each insurer and insured and will be treated separately herein. The following constitutes our findings of fact and conclusions of law.

BACKGROUND

A. The Parties and Policies

At all relevant times for purposes of this litigation, VES and Armenia were New York corporations engaged in the business of buying and selling green coffee, including Mexican green coffee for resale to American roasters. These purchases were financed by various American banks. Pretrial Order ("PTO") at 2-3.
Effective January 1, 1985, Atlantic issued to the parent of VES and its subsidiaries an "all risks" open cargo insurance policy covering many commodities, including green coffee purchased by VES in Mexico. This policy contained no exclusions for losses caused by conversion, theft, misappropriation or "mysterious disappearance" of coffee and imposed no obligations on VES to inspect its inventory stored in Mexican warehouses. Ex. 71.
Effective September 6, 1989 INA bound for the account of Armenia an "all risks" open cargo insurance policy covering coffee purchased by Armenia in Mexico. This policy similarly contained no exclusions for theft, misappropriation or "mysterious disappearance" of coffee. Ex. 92.

B. The Trade Practices

The coffee which is the subject of this litigation was purchased from Cafetalera Zardain Hermanos S.A. de C.V. ("Cafetalera Zardain"), a Mexican corporation the principals of which were Carlos Zardain Herrerias and his younger brother, Ricardo. In its normal business operation, Cafetalera Zardain purchased coffee from growers, owned or leased storage warehouses and mills, and exported coffee to countries throughout the world. PTO at 3.
Cafetalera Zardain utilized the facilities of two warehousing authorities, Almacenadora Somex S.A. ("Somex") and Almacenadora Creditzam S.A. ("Creditzam"). Somex and Creditzam are Mexican corporations authorized to operate warehouses and to issue certificates of deposit representing coffee deposited in those warehouses. Id.[2]
*865 It was on the strength of these certificates of deposit, or warehouse receipts, that VES and Armenia obtained pre-export financing from their bank lenders. Zardain would convey these certificates to the purchasers, who would make interim payments for the coffee at that time. Transcript of Trial Proceedings Dated June 13-15, 20-23, 27-30, 1994 ("Tr.") 1180-81. Meanwhile, the coffee represented by these certificates would remain stored in the Mexican warehouses. When the purchasers eventually wished to have the coffee brought into the United States, the warehouse receipts would be returned to Mexico and transmitted to Somex or Creditzam, who would release the amount of coffee represented by the receipts and cause their cancellation. Zardain would subsequently mill the coffee and truck it to the purchasers in Laredo, Texas or another United States port of entry. Tr. 717, 1181-82.
During the relevant periods, Zardain tendered to VES warehouse receipts for coffee in three direct and five habilitated Somex warehouses, as well as one Creditzam habilitated warehouse. VES duly declared these nine warehouses as insured locations under the warehouse risks cover of the Atlantic policy. Zardain similarly tendered to Armenia warehouse receipts for coffee stored primarily at two Somex direct warehouses, and Armenia declared this coffee under its INA policy. Plaintiff-insurers maintain that these warehouse receipts tendered by Zardain to VES and Armenia were fraudulent and that the coffee these receipts supposedly represented never was deposited in the Mexican warehouses.
The coffee industry in Mexico at all relevant times was subject to the authority and governance of the Instituto Mexicano del cafe ("Inmecafe"), an agency of the Mexican government. Prior to July 1989, Inmecafe conducted quarterly surveys of coffee in all warehouses throughout Mexico. The results of the surveys were reported to the International Coffee Organization ("ICO"), an international cartel which, until early July 1989, established quotas on exports of coffee. Tr. 634-35, 658-59.

C. The Insurance Claims at Issue

On October 26, 1990, VES and its lender banks filed a claim under its Atlantic policy for the loss of the equivalent of 165,564 69-kilo bags (25,185,165.21 pounds) of prima lavado export quality Mexican green coffee or its equivalent in pergamino,[3] which were discovered to be missing from storage warehouses in Mexico. On November 2, 1990, Atlantic in effect denied this claim by filing a declaratory judgment action alleging that VES had "failed to demonstrate or prove that the alleged stolen, lost and/or missing coffee was ever physically deposited in the named warehouse covered under the Policy."
On October 23, 1990, Armenia submitted a claim to INA for some 11,998 bags (1,825,105 pounds) of Mexican green coffee that were discovered to have mysteriously disappeared from at least two of the Somex warehouses from which VES also claims to have lost coffee. On December 20, 1990, INA denied this claim by filing a declaratory judgment complaint alleging, similar to Atlantic's complaint, that the insured failed "to establish that the coffee alleged to have been stolen, lost or missing was at any time actually physically placed in warehouses at insured locations in Mexico."

DISCUSSION

A. Applicable Law

In previous litigation involving VES and Atlantic, the Court of Appeals for the *866 Second Circuit determined that the connection between the Mexican coffee at issue in these consolidated cases and maritime commerce "was simply too speculative and attenuated to justify admiralty and maritime jurisdiction." Atlantic Mut. Ins. Co. v. Balfour Maclaine Int.'l, Ltd., 968 F.2d 196, 200 (2d Cir.1992). Plaintiffs nevertheless argue that we should apply federal maritime law to the underlying issues of the case. We disagree. Because there is no admiralty jurisdiction over the claims in this case, it follows that there is no basis for applying maritime law. Cf. 1 Steven F. Friedell, Benedict on Admiralty § 114 (7th ed. 1994) ("If a case is capable of being brought in federal court under that court's admiralty jurisdiction, the rights and liabilities of the parties are governed by maritime law...."). Therefore, except as discussed below with respect to the relevance of Mexican law to the effect to be given to Mexican warehouse receipts, we find that New York law governs the rights of the parties herein.

B. Burden of Proof that Coffee Ever Existed

The insurers' principal contention is that VES and Armenia have failed to prove that the allegedly "lost coffee" ever in fact was deposited in the named warehouses or ever existed. Insurers rely on Curacao Trading Co. v. Federal Ins. Co., 137 F.2d 911 (2d Cir.1943), cert. denied, 321 U.S. 765, 64 S.Ct. 521, 88 L.Ed. 1061 (1944), which stands for the proposition that insurance against "physical loss or damage from any external cause" is not tantamount to a guarantee of a warehouseman's fidelity. Id. at 914. In other words, even an "all risks" insurance policy does not protect the insured against losses resulting from the purchase of fraudulently issued warehouse receipts. To recover under such an insurance policy, the insured must demonstrate that it suffered actual physical loss or damage to its property. Id.
In Curacao, however, it previously had been held in proceedings to which the plaintiff-insured was a party that the cocoa beans at issue were owned by other parties and that plaintiff therefore had no insurable interest in the beans. Id. at 913. Curacao's holding that a plaintiff who holds concededly spurious warehouse receipts and who has no insurable interest in the insured cargo cannot recover on a policy insuring against physical damage therefore does not address the principal issue now raised before this Court.
In these consolidated cases, where it has not been previously established and is not conceded that the warehouse receipts are spurious and that the insured lacks an insurable interest, a critical question relates to the burden of proof. We note that there has been no direct evidence of the circumstances which resulted in the absence from the relevant warehouses of the coffee in question. In such a case, we believe that the insured under an all-risk policy without exclusions has the initial burden of showing that the coffee was at one time in existence and is now, for whatever reason, no longer available. The burden then shifts to the insurer to establish that the coffee never existed and that the cause of the loss was, as in Curacao, spurious warehouse receipts. See Pan Am. World Airways, Inc. v. Aetna Casualty & Sur. Co., 505 F.2d 989, 999 (2d Cir.1974); Allied Van Lines Int'l Corp. v. Centennial Ins. Co., 685 F.Supp. 344, 345-46 (S.D.N.Y. 1988) ("[The insured] has no burden to prove the cause of the loss, and all-risk coverage extends to unexplained losses.") (citations omitted).

1. The Insureds' Prima Facie Case

The insureds have presented evidence which establishes that the coffee in question was purchased in the ordinary course of business and pursuant to long established trade patterns. See Tr. 653, 678-81, 714-17, 1179-1182; C. Zardain Dep. 48-49, 57, 58, 60, 62-66, 239. They have further shown that they received warehouse receipts (certificates of deposit) valid on their face issued by warehouse facilities duly authorized by the Mexican government to issue such receipts, see PTO at 3, 15-16; Acosta Opinion at 4-5; Tr. 1180-81; C. Zardain Dep. 48-50; Ex. 45, and that the coffee represented by such receipts is not available to them. They further show that weekly inspections conducted by these governmentally-licensed warehouse agencies confirmed the existence of the coffee at the *867 time of the inspections. See Tr. 919-61; Ex. N; Ex. 207; Zamora Dep. 48-56; Delgado Dep. 10-12, 14-19; Orozco Gutierrez Dep. 33, 50-59, 62. The insureds assert that in demonstrating the foregoing they have sustained their burden of presenting a prima facie case. We agree.
The insureds alternatively assert that, as a matter of Mexican law, controlling as to this issue, the warehouse receipts, without more, constitute a prima facie case as to all parties, including the third party insurers, that the coffee existed and that they had ownership rights to the coffee. To this effect, they have introduced the opinion of a Mexican law expert, Dr. Miguel Acosta Romero. Acosta Opinion at 3-4, 11. The insurers disagree and have introduced the opinion of another Mexican law expert, Mr. Luis Mauricio Ibarrola Serrano, to the effect that, whatever probative value Mexican warehouse certificates may have as to the signatories to such certificates, they do not constitute prima facie evidence as to the third party insurers. Ibarrola Opinion at 8-12.
On balance, we find more persuasive the opinion expressed by Dr. Acosta Romero that the certificates do establish a prima facie case that the coffee existed and was owned by the insureds. But we emphasize that we are not called upon to determine what weight should attach to the certificates standing alone. Nor is this a case where the significance of the certificates arises in a controversy involving competing ownership claims. Rather, here, the question is whether the insureds, having established purchases in the ordinary course of business pursuant to an established industry pattern of trading, and holding certificates regular on their face, have established a prima facie case that the coffee in fact existed and was owned by them. The existence of confirmatory inventory reports we believe makes this an even stronger case. In other words, we find that, apart from the intricacies of Mexican law or any special status accorded the certificates, as a matter of New York law or any other arguably relevant law,[4] each insured has established a prima facie case.

2. The Insurers' Rebuttal

Plaintiff-insurers have introduced no direct evidence as to the cause of the coffee shortage but have relied principally on two main contentions to support their theory that the coffee never existed. First, they assert that Cafetalera Zardain and its principals were corrupt and engaged in fraudulent activities and that the various inspectors who signed the Somex inspection reports were also corrupt. Therefore, they argue, the Court should conclude that the warehouse receipts tendered by Zardain to VES and Armenia were fraudulent and should also reject any reliance on the Somex inspection reports.
In response to this first assertion, however, we find that the insurers have failed to meet their burden of demonstrating that such corruption existed and that it was the cause of defendants' losses. The insurers note that Carlos Zardain operated the Somex habilitated warehouses where his own company's coffee was allegedly deposited and maintain that it would therefore have been easy for Zardain to influence the Somex inspectors or to issue fraudulent warehouse receipts. However, plaintiffs provide no evidence of actual wrongdoing. Although plaintiffs assert without contradiction that Carlos Zardain and Ricardo Zardain were convicted of "generic fraud" in Mexico and that all appeals on these convictions have been exhausted and/or denied, see PTO at 28; C. Zardain Dep. at 130; R. Zardain Dep. at 57, plaintiffs do not demonstrate any nexus between these convictions and the subject matter of this controversy.[5]
Moreover, the insurers cannot argue that they have had no access to persons who would have knowledge of such wrongdoing. We know that Atlantic's investigators interviewed and procured the cooperation of Cafetalera Zardain's warehouse managers, Teodoro *868 Hoppenstedt and Juan Carlos Rivera Silva, who signed the inspection reports at the warehouses where most of the missing coffee was stored. Tr. 1314-17; Hoppenstedt Dep. 220-22, 301-03; Silva Dep. 7, 95, 122-23. In their depositions, Hoppenstedt and Rivera did not indicate that Somex and Creditzam warehouse inspectors were defrauded or that the coffee that the inspectors documented in their reports did not actually exist in the warehouses. If Hoppenstedt and Rivera conspired with Zardain to create fictitious inventories to mislead the Somex inspectors, then the insurers, who had the cooperation of these employees as well as the burden of proof on this issue, should have elicited such testimony from them.
In addition, the evidence shows that in August and September, 1990, Cafetalera Zardain was entitled to a $2.5 million pre-financing payment that VES had agreed to pay under the new 1990-91 crop year contract. Ex. 22.[6] When VES proffered this payment to Carlos Zardain, he advised that they hold off because he was having difficulty buying new crop coffee. Tr. 1194-98, 1224-25, 1232-35. We think it unlikely, if Zardain were conspiring to defraud VES, that he would have declined a payment from VES of such a large sum of money to which he was entitled.
The insurers' second basis in support of their theory that the coffee at issue never in fact existed is their contention that a net book inventory undertaken by Norman Reitman & Company, as well as independent inspections conducted by the Mexican Coffee Institute (Inmecafe), demonstrate that Cafetalera Zardain did not purchase enough coffee during the relevant time periods to satisfy the certificates of deposit issued by Somex and held by the insured parties. It therefore follows that certificates must have been issued as to Cafetalera Zardain for non-existent coffee.
However, we are persuaded by the testimony of Ira Zecher, defendants' witness and an expert auditor at Ernst & Young, that sufficient coffee did exist in the Mexican warehouses to match the certificates of deposit held by the insureds. In a report prepared for VES on April 19, 1991, Ernst & Young concluded that "the books and records of Cafetalera Zardain ... and other available documentation support Zardain's representation that during the period October 1, 1989 to September 30, 1990, it purchased approximately [$31.4 million] of coffee and that the purchases were delivered to and entered into its warehouses." Ex. AI at 1; Tr. 911-12. Zecher testified at trial that Ernst & Young representatives traveled to Mexico City on numerous occasions and examined a sample of 3,224 individual receiving reports ("romaneajes"), as well as related check vouchers ("polizas de cheque"), supplier ledger cards ("tarjetas"), bank statements, and supplier confirmations, in reaching this conclusion. Tr. 912-16; Ex. AI at 2.
In addition, Ernst & Young reviewed and analyzed 215 periodic physical inventory reports prepared by Somex and two reports prepared by Creditzam. It found that these reports were reliable and that they supported defendants' conclusion that there was sufficient coffee in the Mexican warehouses during the relevant periods to satisfy the certificates of deposit held by both VES and Armenia. Ex. AI at 3; Tr. 919-97. Ernst & Young also compared VES's records as to the certificates of deposit with Zardain's records and found that these records coincided, lending further support to the insureds' claims. Ex. AI at 5; Tr. 987-88.
Plaintiffs argue, in part, that we should disregard Ernst & Young's findings because they rely on inspections carried out by Somex and Creditzam, which plaintiffs contend were faulty or fraudulent. Examining all of the evidence presented, however, we find that plaintiffs have failed to meet their burden of proving that such error or fraud ever took place.[7] In the absence of such proof, we believe Ernst & Young's analysis, incorporating *869 the first-hand observations of trained inspectors, to be more persuasive than the theoretical net book inventory of Norman Reitman & Co, which ignored these observations. Tr. 136-37.[8]
In sum, the problem with the insurers' rebuttal case is that it presumes, without proper support, that much of the evidence relied upon by insureds in making out their prima facie case is fraudulent. As defendants argue, plaintiffs' theory that the missing coffee never existed relies on the unproven assumption of "either a vast collusion between the warehouse inspectors and the Zardain warehouse managers, or a systematic, inexplicable ineptitude on the part of the twenty or so trained Somex inspectors who inventoried the coffee in the warehouses." VES's Post-Trial Memorandum at 7. For the reasons stated above, we find that the insurers have not adequately established that the coffee never existed and therefore have not met their burden of rebutting the insureds' prima facie case. Consequently, we reject the insurers' primary argument for declaratory relief.[9]

C. INA's Additional Bases for Declaratory Relief

Plaintiff-insurer INA maintains that there are several additional bases for denying Armenia's insurance claims. We address each of these arguments in turn.

1. Armenia's Policy is Not Void Ab Initio

INA argues that, under the doctrine of uberrimae fidei, we should declare Armenia's policy void ab initio, because Armenia misrepresented material facts to INA at the time of its application for coverage. We disagree.
The doctrine of uberrimae fidei requires that parties to a marine insurance contract accord each other the utmost degree of good faith. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Under this doctrine, the assured is under an obligation, without inquiry, to disclose every fact within his knowledge that is material to the risk. See Puritan Ins. Co. v. Eagle S.S. Co., S.A, 779 F.2d 866 (2d Cir. 1985). The insured's failure to meet this stringent standard entitles the underwriter to void the policy ab initio. Knight, 804 F.2d at 13.
However, the doctrine of uberrimae fidei does not apply in this case, because the warehouse storage risks at issue are not marine risks. The Court of Appeals for the Second Circuit has already held, with respect to the Atlantic-VES dispute, that warehouse storage risks such as these fall outside the scope of federal admiralty and maritime jurisdiction:
Even construing the facts in Atlantic's favor, the coffee never became marine cargo and never entered the maritime stream of commerce.... The goods' connection with maritime commerce was simply too speculative and attenuated to justify admiralty and maritime jurisdiction in this case.
*870 Atlantic Mutual, 968 F.2d at 200 (citing Paul Marsh, Inc. v. Edward A. Goodman Co., 612 F.Supp. 635 (S.D.N.Y.1985)). Although the INA policy also included coverage for ocean transit risks, Armenia declared separately for its warehouse storage risks and paid separate premiums. Ex. 92. We therefore believe that the warehouse storage risks in this case should be treated as ordinary insurance risks and that, instead of the stringent "marine rule," we should apply the "ordinary" New York rule regarding concealments by applicants for insurance. See Stecker v. American Home Fire Assur. Co., 299 N.Y. 1, 84 N.E.2d 797, 798-99 (1949) (contrasting the two rules); see also Thebes Shipping, Inc. v. Assicurazioni Ausonia SPA, 599 F.Supp. 405, 427 (S.D.N.Y.1984).
Under this "ordinary" New York standard, the mere nondisclosure of a fact, concerning which the insured has not been asked, is not a ground for avoidance of the insurance contract. Sun Ins. Co. v. Hercules Secs. Unlimited, Inc., 195 A.D.2d 24, 605 N.Y.S.2d 767, 771 (N.Y.App.Div.1993) (citing Sebring v. Fidelity-Phenix Fire Ins. Co., 255 N.Y. 382, 174 N.E. 761 (1931)). In other words, "[i]f fraud be absent, the assured may remain silent in respect to many matters concerning which the underwriter fails to question him." Sebring, 174 N.E. at 762. In order to constitute fraud, "there must be a willful intent to defraud and not a mere mistake or oversight." Sun Ins., 605 N.Y.S.2d at 771.
Applying this "ordinary" standard, we find that INA has not introduced evidence that, at the time of Armenia's application for insurance coverage, INA requested information from Armenia that it did not receive. In addition, INA has not demonstrated that Armenia fraudulently withheld information from INA that it should have divulged. INA alleges that at the time of Armenia's application for insurance in September 1989, it failed to disclose to INA two pending losses involving the mysterious disappearance of coffee from Mexican warehouses. However, we are persuaded by the trial testimony of Joseph Apuzzo, Armenia's former president, that he was unaware of these losses at the time INA bound the Armenia policy, see Tr. 1472, 1474-75, 1494-96, and indeed would have been unlikely to change underwriters had he been so aware. Tr. 1494-96, 1504.[10] We therefore reject INA's request that we void Armenia's insurance policy ab initio.[11]

2. Untimely Notice

INA next argues that we should not allow Armenia to collect under its insurance policy because Armenia neglected to give prompt notice to INA of its loss. The policy at issue contains a "Notice of Loss" provision that states:
The Assured shall report to Johnson & Higgins ... (for transmission to the Assurers) or to the agents of the Assurer if there be one at or near the place where the loss occurs ... every loss or damage which may become a claim under this insurance as soon as may be practicable after it becomes known to them.
Ex. 92 (Clause 31). INA contends that Armenia was aware of its losses under the policy "at least ten months prior" to its submission of its formal claim to INA on October 23, 1990, and that Armenia therefore violated the "notice of loss" provision.
We reject this contention. The "notice of loss" provision clearly required Armenia to notify either its insurance broker, Johnson & *871 Higgins ("J & H"),[12] or INA of potential losses. INA admits in its post trial briefs that Armenia advised J & H on January 3, 1990 and March 21, 1990 of potential losses in Mexico that might possibly be subject to an insurance claim. See Plaintiffs' Post Trial Findings of Fact & Conclusions of Law ¶¶ 313-15, 318 (citing Ex. 135, Ex. 132). We find that these actions by Armenia were adequate to satisfy its obligations under the insurance policy.
Alternatively, even if INA's late-notice defense has merit, we find that INA waived this defense by failing to include it in its original declaratory judgment complaint on December 20, 1990. Under New York law, "when an insurer refuses to pay a claim based on one ground that it specifically states, the insurer waives all other grounds for denying liability." Middle East Eng'g & Dev. Co. v. Arkwright-Boston Mfrs. Mut. Ins. Co., No. 86 Civ. 834, 1987 WL 17419, at *2 (S.D.N.Y. Sept. 16, 1987). See New York v. Amro Realty Corp., 936 F.2d 1420, 1433 (2d Cir.1991) (liability insurer's waiver of late-notice defense was "conclusively established" by its assertion of several grounds for disclaiming coverage, without asserting late-notice ground until later); Luria Bros. & Co. v. Alliance Assurance Co., 780 F.2d 1082, 1090 (2d Cir.1986).
INA argues that it could not have waived its late-notice defense in December 1990 because it had no knowledge at that time that Armenia had violated the notice of loss provision. We reject this argument. INA is correct that "an insurer cannot waive a defense by asserting another defense as grounds for declination if it had no knowledge of the facts giving rise to the unasserted defense." Luria Bros., 780 F.2d at 1090. However, even if an insurer does not have actual knowledge of all the pertinent facts about a defense when it declines liability on other grounds, if it has sufficient information to put it on notice of the defense, the insurer has constructive knowledge, which is sufficient for waiver. Id. at 1091; Middle East Eng'g, 1987 WL 17419, at *2.
We conclude that INA had sufficient information to give it either actual or constructive knowledge of the critical facts when it denied liability in December 1990. The record demonstrates that INA was aware of problems in Mexican warehouses in general even before the INA-Armenia policy was bound in September 1989. Tr. 842-43, 861, 863, 878. In addition, INA learned by January 8, 1990 that Armenia had suffered losses under its prior policy. Tr. 789, 856; Brosnan Dep. 69-71; Ex. 129. Reports commissioned in response to this January information cautioned INA about purported illegal activities in Mexican warehouses. Tr. 857-58, 861; Exs. 50, 51. Between October 23, 1990, when Armenia submitted its insurance claims, and December 20, 1990, when INA filed its declaratory judgment action, INA had a further opportunity to investigate Armenia's losses. Indeed, INA's attorney, James Sweeney, was part of a team that travelled to Mexico in mid-October and met with Somex and Creditzam officials. PTO at 4; Tr. 1252-57. INA has not demonstrated that documents were withheld by Armenia or that INA was denied access to records sufficient to examine Armenia's claim. In short, if Armenia truly was aware of its losses "at least ten months prior" to its submission of its formal claim, then INA should have had enough information by December 1990 to alert INA to this fact.[13]

D. VES's Claim for Non-Contractual Damages

In addition to the contractual damages claimed by both of the insured plaintiffs and awarded by the Court in this decision, VES asserts a further claim for the damages it allegedly sustained as a consequence of *872 Atlantic's "bad faith" in denying VES's insurance claims on November 2, 1990. Under New York law, an insurer owes a duty of good faith to its insured, see Gordon v. Nationwide Mut. Ins. Co., 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E.2d 849, 854 (1972), cert. denied, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973), and the insured can collect damages for "harm that naturally and foreseeably flows" from a violation of this duty, see Soto v. State Farm Ins. Co., 83 N.Y.2d 718, 613 N.Y.S.2d 352, 635 N.E.2d 1222, 1224 (1994). VES argues that Atlantic violated its duty of good faith by precipitately denying VES's insurance claims without conducting the necessary prior investigations. This bad faith act, VES alleges, resulted in a foreseeable and massive withdrawal of capital by VES's lending banks and eventually in the loss of VES's entire going-concern value, amounting to $42 million.
We find, however, no evidence of bad faith on the part of Atlantic. We are persuaded by the trial testimony of one of Atlantic's managers, Allan Saunders, that Atlantic feared that VES was on the verge of bankruptcy yet was making representations to the public that its Mexican coffee losses were fully insured. Tr. 1294, 1318; Ex. 252. Atlantic believed that VES would not prevail on its claim and that if Atlantic did not promptly make this position clear, it could later be alleged that Atlantic had lulled entities with a financial interest in VES's viability into a false sense that the claim was valid and would be paid. Thus, in order to avoid multiple lawsuits by American and European banks, Atlantic denied VES's claim by bringing its own declaratory judgment action on November 2. Tr. 1294-95. Moreover, VES itself contributed to Atlantic's expeditious denial of VES's claim by invoking, in its claim submission letter, clause 32(b) of the insurance policy, see Tr. 1287; Ex. A., which would have required payment of the loss within 30 days. See Ex. 71.
Further, this is not a case in which the insurer took one stance prematurely and then changed its position after the publicity had already caused harm to the insured. Atlantic took a reasonable, although ultimately unsuccessful, legal position that it continued to maintain throughout the course of litigation. Under these circumstances, the defendant banks and other creditors of VES and Balfour were arguably benefited by knowing as soon as possible that Atlantic would oppose VES's insurance claim. In short, we find no bad faith on the part of Atlantic and therefore deny VES's claim for consequential damages.[14]

CONCLUSION
For the reasons stated above, this Court dismisses plaintiffs' claims for declaratory judgment and grants judgment in defendants' favor on their insurance claims. Defendant VES's request for non-contractual damages is denied.
Submit order within 30 days from the date of this Opinion.
NOTES
[1] The remaining named defendants are banks that financed the coffee purchases by the insureds.
[2] Mexican warehousing authorities, or Almacenadoras, operate two types of warehouses to store coffee or other merchandise. In a "direct warehouse," goods are stored under the supervision of the Almacenadora's own employees. In an "habilitated warehouse," goods are stored under the supervision of third parties authorized by the Almacenadora to operate the warehouse on its behalf. With regard to Cafetalera Zardain's business, Creditzam operated only an habilitated warehouse, and Somex operated both direct warehouses and habilitated warehouses. PTO at 14.
[3] Pergamino and prima lavado are two separate stages in the processing of "arabica" coffee. Growers in Mexico typically harvest their coffee and sell it to exporters or processing mills in the "pergamino" stage. Coffee in the pergamino stage still has a husk or parchment around the bean which is removed by a milling process. Milling removes the husk and transforms the pergamino coffee first into "oro" coffee and then into "prima lavado" export-quality coffee, which is exported to the United States in 69-kilo bags. Tr. 433-43.

Coffee is typically stored in Mexican warehouses either as pergamino or prima lavado. Whether stored as pergamino or prima lavado, the coffee is treated as a fungible commodity. Tr. 1217-19, 1227-29, 1231.
[4] It has already been established that this controversy is not governed by federal maritime law. See Atlantic Mut., 968 F.2d at 200.
[5] Carlos Zardain, at deposition, stated that his arrest "was related to a fraud of Cafetalera in obtaining the financing from exchange currency houses and nothing whatsoever related to the business of coffee." C. Zardain Dep. at 105.
[6] VES would enter into contracts for a particular crop year with Cafetalera Zardain, which would in turn agree to acquire the requisite coffee from Mexican coffee growers.
[7] Plaintiffs argue in part that the Somex inspection reports are deficient because the Somex inspectors converted pergamino to prima lavado on the basis of an 80% conversion rate instead of a 70 or 72% rate, thereby overstating the amount of coffee in the warehouses. Defendants, however, have shown that the 80% rate was taught and approved by Inmecafe and arguably reflected an accepted industry standard. Orozco Gutierrez Dep. pp. 18-19, 20-22. Moreover, defendants have presented evidence that the lower conversion rate, which would have affected only the level of pergamino in the warehouses, would have had only a minor impact on the prima lavado equivalent ("p.l.e.") totals in the summary reports. Ex. AJ. Weighing all of the evidence, we find persuasive the conclusion of Ernst & Young that the inspection reports are reliable. Tr. 919-97.
[8] We note that plaintiff-insurers could have included provisions in their insurance policies requiring the insureds to inspect the Mexican warehouses themselves or to commission third-party inspectors acceptable to the insurers. Plaintiffs also could have commissioned periodic inspections of their own.
[9] The insurers also argue that the insureds cannot recover under the insurance contracts because they have failed to prove that the missing coffee was lost, in fact, during the periods of policy coverage. We reject this argument under the same analysis set forth above. Plaintiffs have presented evidence sufficient to make out a prima facie case that the coffee at issue was deposited in the Mexican warehouses during the periods of coverage. See supra pp. 866-867. Defendants have failed to meet their burden of rebutting this evidence. In any event, we note that both insurers would have waived this basis for relief in that they neglected to include it in their original complaints. See infra p. 871.
[10] At trial, Mr. Apuzzo explained that "[i]f I have a loss, I'm not going to change underwriters and complicate a situation that I'm covered for" and that he would have to be "an awfully stupid businessman" to do so. Tr. 1494, 1496.
[11] INA also alleges that Armenia's insurance broker, Johnson & Higgins ("J & H"), in applying for insurance coverage on behalf of Armenia, falsely represented that Armenia's Mexican operation was being "phased out," causing INA to insure Armenia without conducting its standard inspection procedures. Armenia denies this representation, and we note that the policy contains no cut-off date. Since Armenia made no purchases of Mexican coffee after August 1988, see Tr. 1467, we conclude that Armenia's Mexican operation was in fact being "phased out" at the time Armenia applied for coverage. Thus, even if J & H had made the alleged statement, we find that it would not have been a false representation voiding Armenia's insurance policy ab initio.
[12] Johnson & Higgins was at all relevant times an insurance broker doing business in New York City and is not a party to these consolidated actions. PTO at 3.
[13] INA also argues that Armenia has failed to establish an insurable interest in the missing coffee by reason of an August 14, 1990 novation agreement whereby Armenia gave up its rights to the 1987/88 coffee in return for 1989/90 coffee. Plaintiffs' Post Trial Findings ¶¶ 324-33; Ex. 186. Without reaching the merits of INA's novation defense, we find that it was waived, like INA's late notice defense, because INA failed to include it in its original complaint.
[14] In addition, we note that there is substantial evidence indicating that VES and Balfour were already performing poorly in October 1990 and that Atlantic's denial of VES's claim on November 2 was not the cause of the financial difficulties now being alleged. Tr. 1375, 1381-82, 1443-59; Ex. 77; Ex. 253.