**RIJ PHARMACEUTICAL
CORP., Plaintiff,**

v.

**IVAX PHARMACEUTICALS,
INC., Defendant.**

**No. 02 CIV.4301 CM.**

United States District Court,
S.D. New York.

June 14, 2004.

Jerold C. Feuerstein, Kriss & Feit, P.C., New York City, for Plaintiff.

James E. Cecchi, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, for Defendant.

## MEMORANDUM DECISION AND ORDER

MCMAHON, District Judge.

Plaintiff RIJ Pharmaceutical Corp. ("RIJ") brings this action against Defendant Ivax Pharmaceuticals, Inc. ("Ivax") alleging breach of contract for the sale of goods. Defendant has filed counterclaims alleging the same. Defendant now moves for partial summary judgment on its counterclaims, and partial dismissal of Plaintiff's claims. Plaintiff cross-moves for summary judgment on all its claims, and dismissal of all of Defendant's counterclaims.

For the following reasons, Defendant's motion is denied in part, and granted in part. Plaintiff's motion is denied in its entirety.

## FACTS

*The Parties*

RIJ is a pharmaceutical manufacturer of over-the-counter generic pharmaceutical products for private labels. A significant part of its business is the sale of generic over-the-counter pharmaceuticals for private labels. Thus, RIJ manufactures a line of generic products, bottles the product under the name of the distributor and

ships the goods to the distributor for sale. Ivax, known prior to February 7, 2001 as Zenith Goldline Pharmaceuticals, Inc. ("Goldline"), manufactures and distributes both over-the-counter and prescription generic pharmaceutical products.

Since 1986, Ivax has outsourced to RIJ the manufacture of certain over-the-counter products, including antacid, cough/cold and laxative products, which would then be sold under one or more of Ivax's trade names, or otherwise sold or distributed by Ivax.

There was no underlying contract between RIJ and Ivax. Instead, the parties would typically negotiate price on a product-by-product basis, and Ivax would order the products from RIJ as needed by submitting purchase orders.

In 1999, Ivax began allowing RIJ to bid on multiple products at once. (Brij Gupta Dep., p. 41:8–14 to 43:18).

In September 2000, Ivax conducted a routine audit of RIJ's facilities in Middletown, New York (the "September 2000 Audit"). The purpose of the audit was to ensure the products produced by RIJ to be sold under Ivax's trade names or otherwise sold or distributed by Ivax were being produced in accordance with Ivax's standards, as well as to ensure that RIJ complied in all respects with applicable FDA regulations. Ivax asserts that the audit uncovered numerous deficiencies in RIJ's facilities and manufacturing processes, including bacterial contamination. Ivax subsequently brought these deficiencies to the attention of RIJ. (Counterclaim, ¶¶ 14–15).

### The Instant Complaint

On June 1, 2002, RIJ brought a complaint against Ivax seeking compensation for various actions taken by Ivax during the course of its relationship with RIJ. Specifically, RIJ has alleged that Ivax is liable for (1) unpaid product deliveries to Ivax; (2) inventory for a month's worth of future orders, which RIJ contends that it maintained pursuant to an agreement between the parties; and (3) product orders which Ivax cancelled.

### The October 2000 Purchase Orders

Beginning on or about October 17, 2000, Ivax submitted a series of purchase orders totaling $112,533.76 (the "First Group of Purchase Orders") to RIJ for various pharmaceutical products. The purchase orders were made in accordance with a bid award dated March 16, 2000. (Complaint, ¶ 5). Most of the orders were for a product called Genfiber Powder, the generic equivalent of Metamucil laxative, which accounted for $98,567.68 of the total purchase price. The remaining orders were for Losopan, the generic equivalent of Riopan antacid, and totaled $13,290.16. Upon the completion of their manufacture, RIJ shipped the pharmaceutical products requested in the First Group of Purchase Orders to Ivax. Ivax received the products, along with invoices (the "Invoices") from RIJ requesting payment.

### The Excess Inventory Agreement

During November or December of 2000, Ivax began to increase its orders of Genfiber beyond the amount that RIJ typically shipped each month (approximately 40,000 bottles of regular and 15,000 bottles of orange-flavored Genfiber).

RIJ alleges that because the lead time needed to fill the orders was approximately eight weeks, the parties agreed that RIJ would manufacture and hold one month of Genfiber in its inventory in order to prevent a sudden shortfall (Gupta Dep., p. 89:8–14; pp. 110:22–111 to 111:25; pp. 116:7–20.) Dr. Brij Gupta ("Gupta"), RIJ's President, testified that he believes that the agreement was confirmed in writing between his sales representative, Bi–

Costal Pharmaceutical Corp. ("Bi–Costal") and Ivax. (Gupta Dep., p. 89:55 to p. 90:6.) RIJ, however, has not produced the agreement. In reliance on this agreement, RIJ claims to have expended $100,710 on raw materials, caps and bottles, which were specially manufactured for Ivax or Goldfine, an affiliate of Ivax. (Plf.'s 56.1 Statement of Facts, at ¶ 5.) [1]

Bi–Costal's representative, Brett Barczak ("Barczak"), tells a different story. At his deposition, Barczak testified that there was a "floor stock" program existing between Ivax and RIJ in 1997, when he began working for Bi–Costal. (Brett Barczak Dep., pp. 35:3–36:6.) Under this "floor stock" program, RIJ was to keep one month's worth of inventory on all products, and three months inventory of "key products" to fill orders on a more timely basis. (Barczak Dep., pp. 33:11 to 14; pp. 67:19 to 68:60.) The purported "floor stock" agreement was never reduced to writing. (Id., pp. 70:18 to 71:3.) There was no agreement whatsoever as to what would happen with any leftover inventory if a product or the relationship were terminated. (Id., pp. 68:20 to 69:19.) Barczak testified that it is ordinary practice in the industry for a customer, such as Ivax, to purchase any leftover inventory if a product were discontinued, but if such an agreement existed, it would ordinarily be memorialized in a purchase order or some other writing. (Id., pp. 69:10 to 72:4.)

Ivax denies asking RIJ to manufacture or agreeing to purchase from RIJ an additional one-month of inventory of Genfiber, and claims that no writing memorializing a "floor stock" program or other similar agreement was ever produced by RIJ. In that connection, Sandra Dalling, Ivax's buyer responsible for RIJ accounts, testi-fied at her deposition that Ivax has never made a request, from RIJ or any other supplier, that a supplier keep inventory on hand for future orders unless the request was confirmed by a purchase order. (Sandra Dalling Dep., pp. 19:11 to 20:3.)

*Cancelled Orders*

RIJ also alleges that Ivax is responsible for seven cancelled product orders totaling $80,411.44. On January 18, 2001, Ivax representative Sandra Darling ("Darling") sent a fax to Dr. Gupta cancelling three of the purchase orders, nos. 52993, 52995 and 53864. Dr. Gupta confirmed the cancellations by signing, dating and returning the fax to Darling on January 24, 2001. (Decl. of Lindsey H. Taylor, Exh. D.) The remaining orders were cancelled when Ivax terminated the relationship between the parties on May 8, 2001. (Id. Exh. E.) As of the time that those purchase orders were cancelled, all were overdue. (Id. Exh. F.) At his deposition, Gupta testified that RIJ was "making no claim" for the order cancelled by the January 18 fax because RIJ was able to sell those products to other customers. (Gupta Dep., pp. 118:24 to 120:19.) The total amount of those purchase orders (52993, 52995 and 53864) is $24,098.32.

As to the remaining four cancelled orders, Gupta testified that all of the products RIJ manufactures are suitable for sale to any of its customers that sell the same product, e.g., the generic Mylanta made for one customer would be suitable for sale to another customer distributing generic Mylanta. (Id., pp. 38:10 to 39:12.) Gupta further testified that he believed many of the products manufactured for Ivax's cancelled orders were sold to other customers. The only reason RIJ would

---

**1.** RIJ alleges that Ivax requested a certain style of bottle, which had Goldline's label "silk-screened" on it (i.e. directly printed on the bottle). The bottles cost $42,991.33 in total. (Plf.'s Resp. to Def.'s Statement of Facts, at ¶ 2.)

not be able to sell those products is if they were "slow movers." (*Id.*, pp. 162:24 to 170:4.) He further testified that RIJ had kept records of which products were sold to customers, which were still being held in inventory and which had been destroyed because they expired before they could be sold. (Gupta Dep., pp. 38:10 to 39:12; pp. 162:24 to 170:4; p.. 176:12–15; pp. 100:17 to 101:7.) Ivax made several requests to RIJ for documentation relating to the sales of the products to third parties to which RIJ failed to respond.

As a result of these transactions, RIJ now seeks to recover damages for (1) the cost of the Genfieber and Losopan products, for which Ivax has not paid; (2) the cost of one month's worth of inventory of regular Genfiber and orange-flavored Genfiber that Ivax allegedly agreed to purchase; and (3) the cost of the cancelled purchase orders.

*Ivax's Counterclaims*

On August 16, 2002, Ivax interposed a counterclaim for breach of implied and express warranties against RIJ seeking to hold it liable for (1) certain pharmaceutical products RIJ shipped to Ivax, which Ivax contends were defective; (2) expenses associated with the recall of the allegedly defective products; and (3) consequential damages resulting from the defective and recalled pharmaceutical products.

On January 11, 2001, Ivax received a complaint from a hospital pharmacist that a bottle of liquid Genaton antacid had an unusual smell. The product was returned to Ivax for testing, and the testing revealed that the product was contaminated with bacteria. The bacteria was the same kind of bacteria that Ivax's September 2000 Audit had discovered in RIJ's facilities previously. Following the complaint, Ivax suspended all then-pending orders of liquid pharmaceutical products manufactured by RIJ. (Counterclaim, ¶¶ 17–18).

In subsequent months, Ivax received additional complaints regarding contaminated Genaton and premature product degradation.[2] On March 26, 2001, following the new complaints, Dr. Gupta sent a letter to J.C. Torres at Ivax stating, "RIJ Pharmaceutical Corp. has initiated a voluntary recall of Goldline Brand GENATON ANTACID Lot Numbers 01012, Exp. 10/02 and 01011, Exp. 10/02 contained in white plastic 12 Fl. Oz. Bottles. *This recall is to the retail level.*" (Reply Dec. of Counsel, Exh. A)(emphasis added).[3] Dr. Gupta's March 26, 2001 letter goes on to include instructions to Ivax as to how to proceed with the recall. Those instructions include the statement, "Notify all customers, to the *retail level of the recall,* and make arrangements for return of the product from them." (*Id.*) (Emphasis added). (Aff. of Brij Gupta in Opp. to Mem. for Summ. J., dated May 22, 2003, at ¶ 2). Shortly afterwards, Ivax recalled the two lots of Genaton liquid "at the retail level," in accordance with Dr. Gupta's instructions. (Counterclaim, ¶¶ 19–20).[4]

---

2. RIJ also claims to have received approximately seven different complaints about Genfiber powder. (Counterclaim, ¶ 23).

3. A recall at the wholesale level means a recall of all products in the chain of distribution as far along as wholesalers. For example, in a recall at the wholesale level, all products in the hands of distributors and wholesalers, but not in the hands of retailers or consumers, would be returned. In a recall to the "retail level," all products in the hands of distributors, wholesalers and retailers, but not consumers, would be returned. (Def. Reply Mem. at 4 n. 1.)

4. In the event of a recall, Ivax is obligated to mail notices to all buyers of the non-compliant product, to arrange for and accept the return of the non-compliant product, and to provide either a replacement product or a refund or a credit for the cost of the non-compliant product. (Counterclaim, ¶ 13).

In September 2000, and from December 2000 through March 2001, RIJ delivered to Ivax $74,506 worth of Aluminum Hydroxide Gel (# 00182–0162–40), Genaton (# 00182–1466–39), Losopan (# 00182–6078–39) and Losopan Plus (# 11082–6081–39).[5] Because the goods in question are over-the-counter pharmaceuticals, they are subject to regulations implemented by the Food & Drug Administration (the "FDA"), as well as other Federal and state agencies which are designed to protect the consuming public.

The Food, Drug and Cosmetic Act (the "FDCA") prohibits "The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded," 21 U.S.C.A. § 331(a). The FDCA further provides that "A drug or device shall be deemed misbranded," unless its labels include

> the established name of each inactive ingredient listed in alphabetical order on the outside container of the retail package and, if determined to be appropriate by the Secretary, on the immediate container, as prescribed in regulation promulgated by the Secretary, except that nothing in this subclause shall be deemed to require that any trade secret be divulged, and except that the requirements of this subclause with respect to alphabetical order shall apply only to non-prescription drugs that are not also cosmetics and that this subclause shall not apply to nonprescription drugs not intended for human use.

21 U.S.C. § 352(e)(1)(A)(iii). In addition, on March 17, 1999, the FDA published a final rule establishing a standardized format and standardized content requirements for the labeling of over-the-counter (OTC) drug products (the "Drug Facts regulations"). The final rule became effective on April 17, 2001.

On September 1, 1988, and on June 3, 1992, RIJ executed in favor of Ivax certain guarantees, providing in relevant part

> The undersigned, RIJ Pharmaceutical Corporation, hereby guarantees that no ... drug ... constituting or being part of any shipment or any delivery, now or hereafter made to you by [RIJ], will at the time of such shipment or delivery be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act ... nor will such ... drug ... be an article which may not, under the provisions of Sections 404 and 505 of said Act, be introduced into interstate commerce.

> The guarantee shall be a continuing guarantee and shall be binding upon the undersigned with respect to all .. drugs ... hereafter shipped or delivered to you by the undersigned, or in transit, before the receipt by you of written notice of revocation thereof.

(Decl. of Counsel in Opp. to Plf.'s Motion for Summ. J., Exhs. E & F).

On March 11, 1997, RIJ executed a Continuing Guarantee and Indemnification (the "Continuing Guarantee") in favor of Ivax. The Continuing Guarantee was substantially similar to the prior guarantees, but added a provision for third-party liability and the statement that "The Products shipped to Purchaser will at the time of shipment be in compliance with all applica-

---

**5.** The specific contents and dates of the purchase orders at issue are as follows: (1) 20,-343 16 oz. bottles of Aluminum Hydroxide Gel on September 7 and September 13, 2000 ($38,869.37); (2) 4,298 12 oz. bottles of Losopan Plus on December 14, 2000 ($5,914.48); (3) 3,552 12 oz. bottles of Genaton on February 28, 2001 ($5,274.72); (4) 9,293 12 oz. bottles of Genaton suspension on March 1, 2001 ($13,800); and (5) 6,867 12 oz. bottles of Losopan suspension on March 22, 2001 ($8,158.00).

ble laws, standards, practices and regulations." (*Id.*, Exh. G).

On April 4, 2001, Ivax requested from RIJ a Return Goods Authorization for the $74,506 shipments of Aluminum Hydroxide Gel, Genaton, Losopan and Losopan Plus on the basis that the labels for the shipped products failed to comply with existing federal law and FDA regulations and thereby violated the guarantees made by RIJ with respect to those shipments. RIJ refused to accept return of the shipments on the grounds that it has a longstanding policy not to accept returns of private label merchandise.

On May 9, 2001, Ivax's Purchasing Manager, Linda Camacho, sent a letter to Dr. Gupta discontinuing Ivax's business relationship with RIJ. The letter stated that the decision to cease doing business with Ivax was based on (1) the 2000 Audit; (2) the regulatory compliance issues; (3) quality issues; (4) the recall; and (5) consumer complaints (about the products Ivax purchased from RIJ and resold). The letter also requested two Return Authorizations for excess inventory and for all returns resulting from the recall. (Decl. of Counsel in Opp. to Plf.'s Mem. for Summ. J., Exh. K).

## The Instant Motions

On May 2, 2003, RIJ moved and Ivax cross-moved for summary judgment. RIJ's motion seeks a money judgment of $112,553.76 on all of its claims, the dismissal of Ivax's counterclaim for the return of goods and reimbursement in the sum of $78,682, and dismissal of Ivax's counterclaim for consequential damages and lost profits. Ivax's motion seeks dismissal of RIJ's excess inventory claim, dismissal of a portion of RIJ's demand for payment for Ivax's cancelled orders, and summary judgment on its own claim for reimbursement for recall expenses.

## DISCUSSION

### Standard for Summary Judgment

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under New York law, to establish a claim for breach of contract a plaintiff must plead and prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. *See First Investors Corp. v. Liberty Mut. Ins. Corp.,* 152 F.3d 162 (2d Cir.1998). Summary judgment is appropriate in a breach of contract action where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning. *See Fulton Cogeneration Assoc. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 98 (2d Cir.1996). Contract language is unambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Ins. Co. of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

## THE CROSS MOTIONS FOR SUMMARY JUDGMENT ON THE COUNTERCLAIMS ARE DENIED

### I. Purchase and Sale of Goods

#### A. Rejection of Goods

■ On April 4, 2001, Ivax requested that RIJ authorize the return of $74,506 in over-the-counter pharmaceutical products shipped by RIJ to Ivax between October 2000 and March 2001 on the basis that the

product labels failed to comply with applicable federal drug laws and FDA regulations and were therefore in violation of implied and express warranties given by RIJ to Ivax. RIJ now seeks to dismiss Ivax's counterclaim for these returned goods, arguing that Ivax was not entitled to reject the pharmaceutical shipment because (1) the goods were not defective and, (2) even if they were defective, Ivax did not reject or revoke its acceptance of them within a reasonable time.

Ivax supports its contention that the goods were defective by reciting a number of alleged labeling deficiencies, including a failure to list the products' inactive ingredients in alphabetical order in violation of 21 U.S.C. § 352(e) and a failure to meet the formatting requirements of the FDA's Drug Facts regulations. Although Ivax admits that the FDA did not require companies to be in full compliance with the Drug Facts regulations until April 16, 2001 (shortly after the final batch of allegedly non-conforming goods were delivered), Ivax maintains that standard practice in the pharmaceuticals industry is to begin compliance with new FDA regulations upon publication and that the purpose for the delay between the publication date and effective date is to allow for a "cure period." (Decl. of Jennine Gary, ¶ 7). RIJ contends that no such industry standard applies to the Drug Facts regulations. The question of the existence of the industry standard is material to the reasonable expectations of Ivax with respect to RIJ's delivery of conforming pharmaceutical labels, and therefore presents an issue of fact for this Court, thereby precluding summary judgment for RIJ.[6]

■ The timeliness of Ivax's rejection or revocation of acceptance of the allegedly non-conforming goods is also a factual issue. Under Section 2–602(1) of the New York Uniform Commercial Code, "a buyer is given a reasonable time to inspect goods upon their receipt and to reject them by seasonable notification if they are found to be non-conforming." *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.,* 701 F.2d 1049, 1051 (2d Cir.1983). A buyer who "fails to make an effective rejection," accepts the goods. N.Y. U.C.C. § 2–606(1)(b). Nevertheless, a buyer who has already accepted goods may still revoke his acceptance "within a reasonable time after the buyer discovers or should have discovered the ground" for revocation if the "nonconformity substantially impairs" the value of the good. N.Y. U.C.C. § 2–608. A "reasonable time" depends upon the "nature, purpose and circumstances" of the action at issue, and is therefore to be treated flexibly. NY UCC § 1–204(2); *First Security Mortgage Co. v. Goldmark Plastics Compounds,* 862 F.Supp. 918, 933 (E.D.N.Y.1994). Absent exceptional circumstances, whether an action has been taken within a "reasonable time" is a question of fact. *Sherkate Sahami Khass Rapol,* 701 F.2d at 1051.

Here, RIJ argues that the three-month lag between Ivax's receipt of the majority of the allegedly non-conforming products (January 2001) and its rejection of those products (April 2001) was unreasonable. Ivax attributes the delay to the size and nature of Ivax's business, which it claims

---

**6.** RIJ does not address Ivax's claim that the shipped product's inactive ingredients were not listed in alphabetical order on the container labels as mandated by 21 U.S.C. § 352(e). However, at his deposition, Dr. Gupta testified that Ivax had agreed to provide RIJ with graphics and the format for new conforming labels, but then failed to send them. Ivax counters that it was RIJ's responsibility to revise its labels. Again, disputed issues of material fact prevent me from deciding whether Ivax's actions indicated an acceptance of the nonconforming labels.

did not permit immediate inspections. RIJ counters that Ivax's inspection controls are inadequate.[7] The Second Circuit has noted that exceptional circumstances exist justifying a judicial determination of "reasonable time" where a buyer with actual or constructive knowledge of a product's defect either repeatedly uses the product or continues to make payments on the product and waits six or more months before attempting to reject it. *Sherkate Sahami Khass Rapol,* 701 F.2d at 1051–52. The facts of this case hardly rise to the level of inexcusable delay necessary to invoke those exceptions. The timeliness of Ivax's rejection of the generic over-the-counter pharmaceuticals shipped by RIJ or its revocation of acceptance is therefore a question for the jury.

### B. *Breach of Warranty*

Ivax next contends that RIJ breached several express guarantees by shipping the mislabeled bottles. This claim also survives summary judgment. The clear language of the guarantees promises only that none of the shipped products would be mislabeled *"at the time of such shipment or delivery."* Having acknowledged that the Drug Facts regulations did not become effective until after the final batch of pharmaceutical products were delivered, Ivax cannot now claim RIJ's violation of the Drug Facts regulation as the basis of its violation of the express guarantee. Nevertheless, Section 21 U.S.C. § 352(e) was enacted in 1997, well before RIJ shipped the products currently under dispute. And Ivax has conceded that the bottle labels did not list the inactive ingredients. Thus, RIJ is not entitled to summary judg-

ment on Ivax's breach of warranty counterclaim.

### II. *Consequential Damages*

RIJ also moves to dismiss Ivax's counterclaim for consequential damages and lost profits on the grounds that those damages are overly speculative. Under the U.C.C., consequential damages resulting from the seller's breach include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." N.Y. U.C.C. § 2–715(2)(a). "In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within the meaning of subsection (2)(a)." N.Y.U.C.C. § 2–715(2)(a), cmt. 2.

Ivax claims that the following damages were a reasonably foreseeable consequence of RIJ's breach of warranty: (1) Ivax's lost profits during the time that it was attempting to obtain alternative suppliers for the products previously purchased by RIJ; (2) damages for Ivax's lost market share for Genaton and Aluminum Hydroxide resulting from those products being off the market; (3) damages for Ivax's lost market share for Losopan and Losopan Plus resulting from Ivax not being able to reintroduce those products because they were off the market.

■ "Under New York law, consequential damages for a breach of contract or warranty claim can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation."

---

**7.** In arguing that Ivax had notice of the label's non-conformity upon receipt of the goods, RIJ essentially claims that Ivax did not exercise due diligence. Under the U.C.C., "An organization exercises due diligence if it maintains reasonable routines for communi-

cating significant information to the person conducting the transaction..." N.Y.U.C.C. § 1–201(27). On this record, I cannot say that Ivax's procedures for detecting and communicating product defects were insufficient as a matter of law.

*Hangzhou Silk Import and Export Corp. v. P.C.B. Intern. Industries,* No. 00 CIV. 6344(RLC), 2002 WL 2031591, *7 (S.D.N.Y. Sept. 5, 2002) (citing *Toltec Fabrics, Inc. v. August Inc.,* 29 F.3d 778, 780 (2d Cir.1994)). "[C]onsequential damages for lost profits are recoverable where the buyer is a reseller or a broker." *Canusa Corp. v. A & R Lobosco, Inc.,* 986 F.Supp. 723, 732 (E.D.N.Y.1997) (citations omitted). However, "a calculation and award of lost profits may not be based on speculation." *Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1063 (S.D.N.Y.1996) (citing *Texpor Traders, Inc. v. Trust Co. Bank,* 720 F.Supp. 1100, 1114 (S.D.N.Y.1989)). Instead, a plaintiff seeking to recover lost profits for breach of warranty must meet the following criteria:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

*Coastal Aviation, Inc.,* 937 F.Supp. at 1064 (citing *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 234–35 (1986) (*per curiam*)).

■ Viewing the evidence in a light most favorable to Ivax, I must determine whether Ivax has presented enough evidence to prove to a trier of fact with reasonable certainty that it lost goodwill or future profits, that the amount of that loss was within the reasonable contemplation of both parties, and that any such loss was directly traceable to RIJ's breach of warranty. I find that it has.

Ivax has presented evidence from which a trier of fact may reasonably infer that it sustained some amount of lost profits and that it lost market share for Genaton, Aluminum Hydroxide, Losopan and Losopan Plus as a result of Defendant's breach of warranty. (*See* Deposition of Aldo Perez, p. 25:16–40:7). Although Ivax bases it claim largely on past market conditions, such claims are cognizable under New York law. *Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1134 (E.D.N.Y.1985) (consignee in shipping contract was entitled to recover purchase price and incidental and consequential damages, including lost profits, subject to 30 percent reduction for mitigation, based on estimates generated from past market conditions). In addition, Dr. Gupta testified that he knew that Ivax was in the business of reselling the products it ordered from RIJ, (Gupta Dep., p. 84), and therefore, under § 2–715, RIJ had reason to know of RIJ's consequential damages.

Ivax, however, has not met its burden of demonstrating with certainty how much of its lost market was caused by RIJ's breach. In fact, the deposition testimony of Aldo Perez, Ivax's Director of Financial Planning and Analysis, offered by Ivax as "objective evidence" of the amount of those losses, suggests that any number of factors could have accounted for Ivax's loss of market share for the relevant pharmaceutical products:

> Q: Is the theory that the suspension and/or discontinuance, actually here the suspension of the product is what caused the decrease in the monthly demand?
>
> A: Yes.
>
> Q: Is there any basis for making that assumption?

A: When you say—what do you mean by that?

Q: I mean that you have a mathematical computation which shows that there is obviously a decrease in monthly demand.

A: Right.

Q: So the sole basis of that figure, which is $44,577.28, is just based upon the decrease of the monthly demand of the product?

A: That is correct.

Q: But you didn't take into account, did you analyze any factors which caused the decrease in monthly demand?

A: The assumption that being off the market for that time period effected the demand. That's the assumption.

Q: What causes you to make that assumption? Could it be other factors?

A: I don't know.

(Opp. Dec. of Counsel, Ex. K). As to lost profits, neither party has alleged that the "arrangement" between Ivax and RIJ represents a sales agreement for the continuing purchase of pharmaceutical products beyond those reflected in the existing purchase orders (and potentially in the separately alleged "floor stock" agreement). Therefore, Ivax's lost profits claim for the period during which it sought to obtain a new supplier is limited to such profits as would have been obtained from the existing orders, but not potential future orders. *Texpor Traders, Inc.*, 720 F.Supp. at 1114 (lost profits based on potential customers orders not recoverable).

### III. *Recall Expenses*

Finally, Ivax seeks summary judgment on its claim for reimbursement for expenses incurred in connection with the Genaton recall. Defendant's recall expense totaled $45,394.00. (Deposition of Aldo Perez, pp. 15:2 to 23:8.) RIJ now suggests that "the recall of Genaton was done at the retail level [rather than the wholesale level], which was beyond the necessary recall under the circumstances." (Plaintiff's Response to Defendant's Statement of Facts, at ¶ 3.) However, because RIJ has agreed to reimburse Ivax for *any* costs associated with the recall, (*id.*), the issue of whether RIJ failed to mitigate its retail expenses is mooted. Moreover, Dr. Gupta's letter of March 26, 2001 to J.C. Torres makes clear that it was he, not Ivax, that was responsible for directing the recall at the retail level.

Ivax is therefore entitled to summary judgment against RIJ for $45,394 in recall expenses.

## THE CROSS–MOTIONS FOR SUMMARY JUDGMENT ON THE CLAIMS IN THE COMPLAINT ARE GRANTED IN PART AND DENIED IN PART

### I. *RIJ's Affirmative · Claim for Goods Sold and Delivered*

■ RIJ moves for summary judgment on its affirmative claim for $112,533.76 in goods that were sold and delivered, but not paid for, to Ivax. RIJ's claim for goods sold and delivered is comprised of a $98,567.68 claim for Genfiber, and a $13,966.09 claim for Losopan. The unpaid Losopan shipments to Ivax bear an invoice date of March 19, 2001. (Aff. of Gupta, Exh. E). Because Ivax notified RIJ that the Losopan shipments (and other shipments) were nonconforming on March 20, 2001, and requested a return authorization on April 4, 2001, RIJ's rejection of the Losopan orders was timely. Nevertheless, as discussed above, the issue of whether the Losopan shipments were in fact nonconforming is a question of fact. Therefore, RIJ's motion for summary judgment in its favor is denied to that extent.

■ Ivax has not denied its liability for the Genfiber shipments. Therefore, RIJ is entitled to prevail on its motion for summary judgment regarding those shipments totaling $98,567.68. However, Ivax asks that this Court not order judgment on the Genfiber claim at this time, on the grounds that its counterclaims "more than offset" the $98,567.68 it owes to RIJ. I agree with Ivax.

Where multiple claims or counterclaims are involved in an action and a court has finally resolved only some of the claims, "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed. R.Civ.P. 54(b); *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1091 (2d Cir. 1992). "A Rule 54(b) certification of final judgment on any claim would be inappropriate only if such claim is 'inherently inseparable' or 'inextricably interrelated' to remaining claims." *EMI Music Marketing v. Avatar Records, Inc.*, 317 F.Supp.2d 412, 423 (S.D.N.Y.2004) (quoting *Ginett*, 962 F.2d at 1096). Clearly, the claims and counterclaims in this case qualify as "inextricably interrelated." They arise out of the same underlying set of facts, and require an interpretation of the duties and obligations of the parties pursuant their long-standing business relationship. Given the possibility of offsets resulting from Ivax's counterclaims, I deny RIJ's request to enter judgment at this time against Ivax as to RIJ's Genfiber shipments.

## II. *RIJ's Claim That Ivax is Obligated to Buy Excess Inventory*

Ivax moves to dismiss RIJ's claim that Ivax is obligated to buy inventory purchased by RIJ pursuant to a purported agreement between the parties. The motion is denied.

■ Section 2–201(1) of the New York Uniform Commercial Code governs contracts for the sale of goods over $500. It requires "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." N.Y. U.C.C. § 2–201(1). Generally, the writing must (1) evidence a contract for the sale of goods, (2) be signed, and (3) specify a quantity. *Id.* § 2–201 cmt. 1. The writing need not contain all the material terms, but it must "afford a basis for believing that the offered oral evidence rests on a real transaction." *Id.* Also, the adequacy of a writing for statute of frauds purposes "must be determined from the documents themselves, as a matter of law." *Hilord Chem. Corp. v. Ricoh Elec., Inc.*, 875 F.2d 32, 36–37 (2d Cir.1989) (internal citation omitted).

An exception to the writing requirement exists where "the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business." N.Y. U.C.C § 2–201(3). "Unsalability under this section must be based on the characteristics of special manufacture, rather than on such tests as lost market opportunities or a seller's unrelated inability to dispose of the goods." *Arthur Blum Signs, Inc. v. Transportation Displays Inc.*, 273 A.D.2d 46, 47–48, 709 N.Y.S.2d 49, 51 (1st Dep't.2000).

Here, RIJ claims that there was an agreement between Ivax and RIJ to manufacture and hold in inventory one month's supply of regular and orange-flavored Genfiber. Ivax denies that any such agreement existed. According to RIJ, the cost of producing these goods, together with their containers, was $100,710 (with the bottles accounting for $42,991.33)—well

over the $500 threshold for the Statute of Frauds. Although RIJ had the opportunity to produce documentary evidence of the agreement during discovery, it has not done so. Instead, RIJ claims that the excess inventory was specially manufactured for Ivax. But RIJ has not shown that the "raw materials" used for Genfiber are not suitable for sale to others. Indeed, Gupta testified that the surplus inventory of raw materials not only could have been sold to others, but that some of it in fact had been sold to others. (Gupta Dep., p. 176:12–15; pp. 100:17 to 101:7.) Therefore, the "raw materials" were not specially manufactured, *Norminjil Sportswear Corp. v. T G & Y Stores Co., Inc.*, 644 F.Supp. 1, (S.D.N.Y.1985) (merchandise not within "specially manufactured" exception where discovery revealed that merchandise had been resold), and the only remaining issue is whether the silk-screened bottles could be considered specially manufactured.

Ivax points to *Webcor Packaging Corp. v. Autozone*, 158 F.3d 354, 356–57 (6th Cir.1998) in support of its claim that the silk-screen bottles were not specially manufactured for Ivax. In *Webcor*, Webcor argued that packages it printed containing Autozone's logo were specially manufactured goods, and that Autozone was therefore responsible for its inventory of packing which would have been sold to Autozone's suppliers for packaging auto parts. The court found that the packages were not specially manufactured for Autozone—in part because "The essential goods to be received by Autozone under the arrangements existing at the time of the alleged oral agreement were finished brake parts, not empty "Duralast" cartons." *Webcor*, 158 F.3d at 360.

*Webcor* is distinguishable. Here, Plaintiff's testimony supports the notion that the silk-screened bottles were an essential part of the agreement. According to Plaintiff, Ivax specifically contracted for the silk-screen bottles. (Gupta Dep., p. 86:9–16.) In addition, the need for the excess inventory agreement was a direct result of the eight week lead time needed to process a Genfiber order. The silk-screening process accounted for six of those eight weeks. (Gupta Dep., pp. 87:10 to 88:18.) Thus, assuming that a "floor stock" or similar agreement did exist, there is evidence that an essential purpose of the contract was for specially manufactured bottles, as much as it was a contract for Genfiber.

Moreover, New York law compels a different outcome here than in *Webcor*. In *Meyer Bros. Drug Co. v. McKinney et al.*, 137 A.D. 541, 121 N.Y.S. 845 (3d Dep't 1910), *aff'd*, 203 N.Y. 533, 96 N.E. 1122 (1911), a manufacturing chemist contracted with retailers to purchase various items, which were to be packed ready for retail in specifically designed packages and bottles, and branded or labeled with defendant's name. The court found that because the defendants had contracted for the specially manufactured goods (i.e. the fully assembled product, including the bottles and labels), the contract did not fall within the Statute of Frauds. *Meyer Bros.*, 121 N.Y.S. at 848. Assuming that RIJ and Ivax did in fact have a "floor stock" agreement, therefore, *Meyer Bros.* requires me to find that the Genfiber bottles and labels constitute specially manufactured goods sufficient to take the agreement out of the Statute of Frauds.[8] Ivax will thus be enti-

---

8. Ivax also contends that RIJ has not shown $42,991.33 in damages. While Ivax is correct that the invoices attached to RIJ's papers are not consistent with a damage award of that amount, that is not an issue for this motion. Ivax will have ample opportunity to argue for reduced damages at trial.

tled to present parol evidence of the "floor stock" agreement at trial.

### III. *RIJ's Claim For Cancelled Orders*

Ivax also seeks dismissal of RIJ's claims that it must reimburse RIJ for certain purchase order cancellations.

RIJ has relinquished claims for three purchase orders—Nos. 52993, 52995 and 53864 (totaling $24,098.32). Those claims are therefore dismissed.

As for the remaining four cancelled orders, Gupta testified that RIJ retained records detailing the products allegedly contained in the purchase orders cancelled by Ivax which were actually sold to third parties. Despite repeated requests by Ivax, RIJ has not produced any of these records (nor has it even attempted to address its failure to produce those documents in its opposition papers). It is well settled that where a party fails to provide relevant information within its control concerning the subject matter of the litigation, the Court may infer that the information, if disclosed, would be harmful to the party who fails to provide it. *E.g. Chambers v. Capital Cities/ABC,* 159 F.R.D. 441, 445 (S.D.N.Y.1995); *Weeks v. ARA Services,* 869 F.Supp. 194, 195 (S.D.N.Y.1994); *Intercommunity Relations Council v. U.S. D.H.H.S.,* 859 F.Supp. 81, 83 (S.D.N.Y. 1994); *cf. Gray v. Great American Recreation Ass'n, Inc.,* 970 F.2d 1081, 1082 (2d Cir.1992) ("The non-appearance of a litigant at trial or his failure to testify as to facts material to his case and as to which he has especially full knowledge creates an inference that he refrained from appearing or testifying because the truth, if made to appear, would not aid his contention").

Here, Dr. Gupta's failure to provide Ivax with the relevant records generates the reasonable inference from the evidence that RIJ's records would reflect that it had mitigated its damages by reselling the products for the cancelled orders. Gupta has admitted that at least some of the goods were sold and the only thing which would have prevented a resale is market conditions. The extent to which RIJ was able to sell these goods is solely within RIJ's knowledge. The records reflecting those sales are similarly within RIJ's possession. Because RIJ has admittedly sold some of those goods and failed to produce any records regarding those sales, it is reasonable for me to infer that RIJ was able to resell those goods so as to eliminate most, if not all, damages for the cancelled orders which it might otherwise be able to recover from Ivax. As a result, RIJ is given one final chance—within 10 days of the date of this order—to produce those records. If it does not, its claims resulting from Ivax's cancelled orders will be dismissed in their entirety.

### CONCLUSION

RIJ's motion for summary judgment is **DENIED** in its entirety. Ivax's motion for summary judgment is **DENIED** as to RIJ's claim for excess inventory and the cancelled orders. However, RIJ has 10 days from the date of this order to produce documents detailing any sales to third parties of the products allegedly contained in the purchase orders which were cancelled by Ivax, or it claim for those cancelled orders will be dismissed. Ivax's motion is **GRANTED** in the amount of $45, 394 as to its affirmative claim for recall expenses.

This constitutes the decision and order of the Court.