■ HAVEN ASSOCIATES, Appellant-Respondent, v DONRO REALTY CORP., Respondent-Appellant, et al., Defendants.—In

an action to foreclose two mortgages, the plaintiff appeals as limited by its brief, from so much of a judgment of the Supreme Court, Suffolk County (Sherman, J.), entered March 15, 1984, as, after a nonjury trial, awarded judgment in the principal sums of $379,953 and $74,200 in favor of the defendant Donro Realty Corp. on its first and second counterclaims against the plaintiff, and the defendant Donro Realty Corp. cross-appeals, on the ground of inadequacy, from so much of the same judgment as awarded it the principal sum of only $379,953 on its first counterclaim.

Judgment modified, on the law and the facts by reducing the amount awarded in the fourth decretal paragraph thereof on the defendant Donro Realty Corp.'s first counterclaim from the principal sum of $379,953 to $232,667.61, and by deleting the principal sum of $74,200 awarded to said defendant on its second counterclaim and dismissing that second counterclaim. As so modified, judgment affirmed insofar as appealed and cross-appealed from, without costs or disbursements, and matter remitted to the Supreme Court, Suffolk County, for the entry of an appropriate amended judgment in accordance herewith.

This action was tried by the court without a jury. After trial, the court, pursuant to statute (CPLR 4213 [b]), issued a decision containing its findings of fact and conclusions of law. We are now called upon to review those findings and conclusions to the extent they relate to the grant of judgment in favor of the defendant on its two counterclaims in the principal sums of $379,953 and $74,200, respectively.

By contract of sale dated March 9, 1973, the defendant Donro Realty Corp. (hereinafter Donro) agreed to purchase and the plaintiff Haven Associates (hereinafter Haven) agreed to sell certain land, consisting of sections 2, 3 and 4 of a development designated as "Haven Hills" upon the understanding that the land consisted of 139 building plots upon which Donro could erect one-family houses. The contract of sale expressly referred to a previous agreement between Haven and the Suffolk County Sewer Agency, the County of Suffolk, the Town of Brookhaven, and the Brookhaven Planning Board, dated August 9, 1971, pursuant to which Haven was enabled to connect up to 100 houses at the development to a temporary consolidated cesspool, with the permission of the Department of Environmental Control (hereinafter DEC). The contract of sale between Donro and Haven provided that Haven was to have obtained permission from the DEC for the connection of those 100 houses to the temporary cesspool

within five months from the date of closing. The contract further provided that, within one year of "the date of title" Haven would have made all arrangements with the DEC necessary to permit Donro "to obtain additional permits and C.O.'s * * * for the balance of its property".

The closing took place on April 10, 1973. On that date, Donro issued two separate purchase-money mortgages to Haven, the first to secure an indebtedness of $807,920, and the second to secure an indebtedness of $194,600. It was provided in various riders to these mortgages that within either one year or one year and 20 days Donro would be able to obtain all necessary permits and certificates of occupancy for the balance of the houses to be erected on the 139 lots. Donro's responsibilities in connection with the development of sewage collection and treatment facilities, as set forth in these documents, was limited to the construction of "sewer laterals and main and house laterals".

On April 10, 1973, Donro also executed a document designated as an "assignment and assumption" agreement wherein Donro assumed all of Haven's obligations under the 1971 agreement with the Suffolk County Sewer Agency, except "the obligation to construct the waste water treatment plant referred to in said Agreement".

After the closing, Donro proceeded to sell various lots at the Haven Hills development and to construct houses thereon. Haven, for its part, had obtained the approval of the DEC so as to allow up to 100 of these houses to be serviced by the communal cesspool. Haven had used 23 of those available connections to service houses it had previously built on section 1 of Haven Hills, leaving 77 available hookups for the houses to be erected by Donro on sections 2, 3 and 4. The record establishes that 60 of the 139 lots owned by Donro, located in the southern part of section 3 and all of section 4, could not be connected to the temporary cesspool, because of topographical factors, without a pump station. Donro's president testified that he complained to Haven's president that due to Haven's failure to build a pump station the southern lots were unavailable for sale, and that, consequently, Donro was experiencing financial difficulty. The president of Haven allegedly promised, in January of 1975, to complete the pump station in return for the release of certain funds being held in escrow. Although these funds were released from escrow, Haven never built the pump station or any other part of a permanent sewage treatment plant capable of serving all the lots on the property purchased by Donro. Donro ultimately abandoned the project.

Haven subsequently commenced this action to foreclose on the two purchase-money mortgages, and Donro counterclaimed for damages.

The trial court found correctly that it was Haven's contractual obligation to install a permanent sewage disposal system capable of servicing all of the 139 lots purchased by Donro, and that this obligation necessarily entailed the construction of a pump station. Any ambiguity that may have existed as to whose responsibility it was to construct the pump station, which Haven claims is not part of a "treatment" plant, was properly resolved against Haven. Most importantly, the uncontroverted testimony of Donro's president indicated that Haven's president acknowledged his obligation to construct the pump station. The trial court therefore correctly found that Haven had willfully and knowingly breached its contract. We therefore conclude, as did the trial court, that Donro is entitled to damages in compensation for Haven's breach. It is with regard to the calculation of damages that we differ with the trial court.

On the issue of damages, Haven argues that 77 lots in the northern portions of section 3 and all of section 2 were available for development because the houses to be erected thereon could be serviced by the communal cesspool. Haven further argues that since Donro sold and delivered only 46 lots in total, the absence of a permanent sewage treatment plant capable of servicing 139 lots did not actually cause any damage. We cannot agree with this argument. Donro expected to receive, by May 1, 1974, at the latest, 139 lots available for sale, and, as a result of Haven's breach, received only 77. Thus, 62 lots were never available for sale. After a year's delay with still no construction on the sewage treatment facility, Donro was justified in treating the contract as abandoned and not permitting further damages to accrue by making further improvements and attempting further sales of those 62 lots (see, Losei Realty Corp. v City of New York, 254 NY 41), which comprised the 60 lots in the southern portions of section 3 and all of section 4, and the two lots in section 2 used to house the temporary communal cesspool. Haven's breach was not, as Haven argues, a harmless one—on the contrary, it directly caused Donro to suffer substantial damages.

Haven alternatively argues that Donro was not entitled to an award of lost profits. We reject this contention as well. In order to recover, damages must be proximate in effect, neither speculative nor uncertain, and reasonably foreseen as a result

of the wrong *(see, Lloyd v Town of Wheatfield,* 67 NY2d 809; *Friedland v Myers,* 139 NY 432). Under the facts of this case, lost profit is a proper element of damages *(cf. Manniello v Dea,* 92 AD2d 426).

The trial court held that Donro would be entitled to loss of profit only upon a showing that the failure to sell a lot was the result *solely* of Haven's breach. Applying this principle, the trial court found that Donro had proved that it was entitled to a loss of profit (at a rate of $7,323 per lot) with respect to only 31 of the lots which remained unsold.

First, the burden was not upon Donro to prove that its damages resulted *solely* from Haven's breach of contract, to the exclusion of all other factors. Second, we cannot agree that damages should be limited to 31 lost sales.

It was Donro's burden to show that Haven's breach contributed in a substantial measure to its damages, whereupon the burden shifted to Haven to prove that some intervening cause, such as the economic recession which allegedly affected the housing market from 1973 onward, contributed to the damages *(see, Borne Chem. Co. v Dictrow,* 85 AD2d 646, 650-651; 5 Corbin, Contracts § 999, at 24-25). Haven did, in fact, adduce persuasive evidence of a serious recession in the market for one-family houses in the Town of Brookhaven during late 1973 and the following years, and this may have affected Donro's sales. The evidence adduced by Donro to establish that the subject lots would have been successfully sold but for Haven's breach is no less persuasive. However, the evidence adduced in this regard, including Donro's reduced sales in 1974 as compared to 1973, its admission that sales during the recession were more difficult and its demonstrated inability to sell houses in its inventory in 1975-1976 causes us to conclude that price concessions would have been necessary for Donro to have effected sales of the 62 lots requiring a pump station and sewage treatment facility. Based upon expert testimony in the record we further conclude that Donro could not have expected any profit greater than $2,500 per lot. Donro is, therefore, entitled to recover its loss of profit for the 62 lots which were unsold as a result of Haven's wrongful breach of contract, although in an amount less than that claimed.

In addition, the trial court apparently concluded that the causal nexus between Haven's breach and Donro's damages was stronger with respect to the 31 unsold lots which *could* have been sold (and connected to the cesspool) than with respect to the 62 unsold lots which could *not* have been sold (since they could not be connected to the cesspool). We do not

accept this reasoning, and, thus, must set aside the trial court's conclusions in this regard.

Donro is entitled to damages for loss of profit at the rate of $2,500 per lot for 62 unsold lots, for a total of $155,000. In making this award for loss of profit, we are mindful of the rule that although damages must be reasonably certain *(United States Trust Co. v O'Brien,* 143 NY 284), "nothing like precise mathematical accuracy can be obtained in the calculation of the amount of damages" *(Borne Chem. Co. v Dictrow, supra,* p 650). Prediction of future profit is inevitably speculative to some degree, but this does not render recovery by an aggrieved party impossible. "[S]uch evidence is required as would enable a businessman to make a prediction with reasonable accuracy" *(Stanley Trading Co. v Bensdorp, Inc.,* 278 App Div 641, 643). Here, the estimate of $2,500 as loss of profit per lot is based upon gross profit realized in the sales of a competing development in Brookhaven during the same years. We find that loss of profit has been established with a reasonable degree of certainty.

The trial court erred in another respect, in that it did not award damages for the prorated amounts expended by Donro in making improvements to sections 2, 3 and 4 attributable to the 62 unsold lots. To the extent that Donro's investment in these improvements was lost due to the inability to sell the lots, Donro should be compensated for this as well. In addition to the damages for "gains prevented", discussed above, Donro is entitled to damages for "losses sustained" *(Lieberman v Templar Motor Co.,* 236 NY 139, 149). The latter component of damages has been said by the Court of Appeals to "comprise payments for labor and material, reasonably made in part performance of the contract, to the extent that they are wasted if performance is abandoned" *(Lieberman v Templar Motor Co., supra,* p 149). After reviewing the record, we find, as a matter of fact, that documentary evidence and testimonial evidence support the conclusion that, in section 2, Donro invested an average of $6,304.92 per lot, so that a total of $12,609.84 was invested in the two cesspool lots that, due to Haven's breach, went unsold. Similarly, the record supports a finding that $46,095.10 was invested in needless improvements in section 3, and $12,946 was invested towards improvements in section 4 (in which no lots were sold). Donro's abandonment of the project, necessitated by Haven's breach of its promise to build a sewage treatment plant, also resulted in Donro paying $13,300 to the Town of Brookhaven for its failure to make additional improvements in section 3. We award a prorated

amount of $6,016.67.* For these expenditures, Donro is entitled to the total sum of $77,667.61.

We find, next, that the trial court erroneously awarded Donro the sum of $152,940 for loss of model homes at the site leased from Haven. Donro failed to show that this loss was occasioned by Haven's breach. We also find that Donro has failed to show that it is entitled to any of the remaining items of damages claimed pursuant to its first counterclaim.

As to the second counterclaim, the court awarded $74,200. This represents the amounts paid by Donro pursuant to its purchase-money mortgage for $194,600, the major portion of which was held in escrow until released in January 1975. Pursuant to the foregoing, we have awarded Donro damages for both loss of profit as well as damages for losses due to the costs of wasted improvements. Haven's breach of contract does not alter the fact that Donro was indebted to Haven under two purchase-money mortgages, and was under a legal duty to repay the principal debt with interest. Donro cannot demand to recoup the amounts it paid toward the satisfaction of that debt. Those payments are therefore not legitimate items of damage.

We have reviewed the parties' remaining contentions and find that they are without merit. Gibbons, J. P., Bracken, Weinstein and Niehoff, JJ., concur.

---

* This figure represents $^{19}\!/_{42}$ of the total of $13,300 and is prorated in the same manner as the other damages for improvements to section 3—viz., 19 lots incapable of sale due to the breach, out of 42 lots total.