**NATIONAL MARKET SHARE, INC., a Delaware Corporation, National Market Share, Inc., a Texas Corporation, and Campaign Tel Ltd., a Delaware Corporation, Plaintiffs–Appellants,**

v.

**STERLING NATIONAL BANK, Defendant–Appellee.**

**Docket No. 04–1206–CV.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 29, 2004.

Decided: Dec. 23, 2004.

---

Gregory E. Galterio (Ira N. Glauber, Bradley A. Alperin, of counsel), Jaffe & Asher LLP, New York, N.Y., for Plaintiffs–Appellants.

Robert I. Cantor, Cantor, Epstein & Degenshein, LLP, New York, N.Y., for Defendant–Appellee.

Before: McLAUGHLIN, POOLER, and WESLEY, Circuit Judges.

MCLAUGHLIN, Circuit Judge.

There are three corporate plaintiffs: National Market Share, Inc., a Delaware corporation; National Market Share, Inc., a Texas corporation; and Campaign Tel Ltd., a Delaware corporation (collectively, "NMS" or "the Company"). All three appeal from a damages award of $1 entered after a bench trial by the United States District Court for the Southern District of New York (McKenna, *J.*).

The district court conceded that defendant Sterling National Bank ("Sterling") had breached the duty of good faith and fair dealing owed to plaintiffs when, after agreeing to do so, it failed to honor approximately $800,000 in payroll checks. The court found, nevertheless, it was not Sterling's breach that caused NMS to go out of business; rather, the actions of plaintiffs' principal, Steven Goldberg, were an "intervening cause" of the Company's collapse. Therefore, the court awarded plaintiffs only nominal damages.

On appeal, plaintiffs contend that the $1 award should be vacated and the case remanded to recalculate damages. Specifically, plaintiffs claim that: (1) in the first place, the district court should not have considered *sua sponte* the issue of "intervening cause"; (2) in any event, there was no evidence that Goldberg's actions caused NMS's damages; and (3) the district court erred in failing to award them damages equal to the value of the Company.

Because we conclude that the first two of NMS's contentions lack merit, we find the third to be moot and therefore decline to reach it. Accordingly, we affirm the judgment of the district court in its entirety.

## BACKGROUND

### I. *The Facts*

This case arose when the business relationship between NMS and Sterling soured. We assume familiarity with the underlying facts set forth by the district court, *see Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 99 Civ. 4455 (S.D.N.Y. Feb. 17, 2004) (McKenna, *J.*), and we summarize the background only to the extent relevant to this appeal.

Before its collapse, NMS provided telemarketing services to corporations and political campaigns through seven call centers located across the United States. In April 1996, Sterling agreed to make loans to NMS under a revolving line of credit secured by NMS's accounts receivable. This arrangement made Sterling NMS's sole source of external financing.

In June 1998, NMS brought in Robert Stoloff as Chief Financial and Operating Officer. Stoloff discovered that NMS had been engaging in billing irregularities, and he arranged for NMS principal Steven Goldberg and himself to meet two Sterling representatives, Senior Vice President Stanley Officina and Loan Officer Jonathan Brand. In July 1998, to assure steady financing from Sterling in spite of the irregularities, Goldberg gave Sterling a mortgage on his Manhattan town house. At the time, NMS owed Sterling an outstanding balance of between $7 and $7.5 million.

By the start of November 1998, NMS's loan balance had been reduced to approximately $4.5 million. NMS was expecting to receive over $1.75 million from one of its largest clients, U.S. Satellite Broadcasting ("USSB"), in payment of a receivable generated in October 1998.

November 3, 1998 was Election Day, which was one of NMS's busiest times of the year.

On November 4, 1998, Goldberg and Stoloff met again with Officina at Sterling's offices, this time to confirm that Sterling would honor 5,000 * payroll checks worth approximately $800,000 which NMS intended to distribute the next day. According to the district court, the following transpired:

> Mr. Officina inquired about the forthcoming USSB check, Mr. Stoloff said he expected the check around the end of November or the beginning of December, Mr. Officina requested that Mr. Stoloff call USSB to accelerate delivery of the check, and Mr. Stoloff responded that he was concerned about upsetting plaintiffs' relationship with USSB if he were to do so. Mr. Officina did not tell Mr. Stoloff and Mr. Goldberg that he would not advance funds unless he received the USSB check.

---

* There is a discrepancy in the record about the number of checks issued. The district court found the correct number to be approximately 5,000, *Nat'l Mkt. Share,* 99 Civ. 4455, at 12, whereas plaintiffs refer to only 2,000 checks in their briefs. However, there is no dispute that, whatever their number, the checks were worth approximately $800,000 in aggregate.

*Nat'l Mkt. Share,* 99 Civ. 4455, at 12 (footnote omitted).

Later that same day, having apparently been assured of Sterling's cooperation, NMS sent the payroll checks to its call centers for distribution to employees. On November 4 and 5, the checks were distributed to NMS employees. On November 5, Sterling declined to fund NMS's account, and the payroll checks began to bounce.

According to the district court:

On November 5, 1998, employees of the Des Moines, Iowa, call center whose payroll checks had not been honored appeared, in an angry mood, some demanding cash, one accompanied by a police officer. Plaintiffs' director of field operations, present at the Des Moines location, heard reports of similar activities at other call centers. Mr. Goldberg told him by phone to tell employees to come back the next day when more would be known and the problem would be taken care of. After some new checks were given out on November 5, 1998, payroll managers at plaintiffs' locations were instructed by management not to give out any more checks to employees.

*Nat'l Mkt. Share,* 99 Civ. 4455, at 13.

At around noon or 1 p.m. on November 6, Goldberg received the critical $1.75 million check from USSB ("USSB Check"). He did not, however, notify Sterling that the USSB Check had arrived. Rather, on November 9, Goldberg flew to Minneapolis (where USSB was located) and deposited the check into his own personal bank account.

Although NMS still owed Sterling around $4.5 million, Goldberg used the USSB proceeds to pay off various corporate and personal debts; not any part of it did he give to the NMS employees whose paychecks had bounced.

On or around November 12, NMS ceased operations.

## II. *Procedural History*

Sterling sued Goldberg in New York Supreme Court for conversion and replevin to recover the proceeds of the USSB Check. Goldberg, in turn, counterclaimed for, *inter alia,* breach of the duty of good faith and fair dealing.

In February 1999, while the state court litigation was pending, NMS brought the present diversity action against Sterling in the United States District Court for the Southern District of New York. *See* 28 U.S.C. § 1332(a)(1). NMS alleged breach of contract, breach of the duty of good faith and fair dealing, fraud, wrongful dishonor of checks, and wrongful impairment of collateral.

In January 2000, the New York Supreme Court (Ramos, *J.*) granted Sterling's motion for summary judgment, finding principally that Goldberg had illegally converted the proceeds of the USSB Check, in which Sterling had a secured interest. The Appellate Division, First Department, affirmed this finding and, in large part, the grant of summary judgment. *Sterling Nat'l Bank v. Goldberg,* 277 A.D.2d 45, 715 N.Y.S.2d 409, 411 (1st Dep't 2000). However, finding issues of fact "as to whether Sterling breached the implied covenant of good faith and fair dealing when it precipitously cut off the debtors' line of credit without notice," the Appellate Division reinstated Goldberg's counterclaim for breach of the implied covenant. *Id.*

In March 2001, Judge McKenna in the Southern District of New York, in turn, granted Sterling's motion for summary judgment on each of NMS's claims brought in federal court, except its claim for breach of the duty of good faith and fair dealing. *See Nat'l Mkt. Share v. Ster-*

*ling Nat'l Bank,* 2001 WL 262589 (S.D.N.Y. Mar.14, 2001). In December 2001, Judge McKenna began an 8–day bench trial on that issue.

In February 2004, Judge McKenna rendered his decision. Applying New York law, the district court held that Sterling had acted in bad faith in dishonoring NMS's payroll checks and thus breached its duty of good faith and fair dealing. *Nat'l Mkt. Share,* 99 Civ. 4455, at 15–16. However, the court concluded that NMS had not demonstrated that Sterling's breach *caused* NMS's demise. Rather, the court found, its collapse was caused by another "intervening cause," namely, Goldberg's failure to deliver the USSB Check to Sterling on November 6. *Id.* at 20. In the court's view, Sterling "[could ]not be held liable for damage occurring after [ ] Goldberg received the USSB check." *Id.* Finding further that "[t]he damages that occurred on November 5 and 6, 1998," prior to Goldberg's act, were "so uncertain," the court concluded that "they, too, [could ]not be recovered." *Id.* at 21. Thus, the court awarded NMS only nominal damages of $1. *Id.* at 22.

This appeal by NMS followed.

## DISCUSSION

■ Under New York law, a duty of good faith and fair dealing is implied in every contract. *E.g., United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 64 (2d Cir.2004). The duty comprises "any promises which a reasonable person in the position of the promisee would be justified in understanding were included [in the contract]." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (internal quotation marks omitted). Neither party disputes on appeal that Sterling breached its duty of good faith and fair dealing by failing to fund NMS's payroll checks; the only issues before us concern damages.

■ In New York, breach of the implied duty of good faith and fair dealing " 'is merely a breach of the underlying contract.' " *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992) (quoting *Geler v. Nat'l Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991) (citations omitted)).

■ To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach. *RIJ Pharm. Corp. v. Ivax Pharms., Inc.,* 322 F.Supp.2d 406, 412 (S.D.N.Y.2004); *see also First Investors Corp. v. Liberty Mut. Ins. Corp.,* 152 F.3d 162, 168 (2d Cir.1998). "One who violates his contract with another is liable for all the direct and proximate damages which result from the violation." *Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N.Y. 205, 209, 4 N.E. 264 (1886); *accord Losei Realty Corp. v. City of New York,* 254 N.Y. 41, 46, 171 N.E. 899 (1930) (quoting *Wakeman* ).

■■ Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages. *Wakeman,* 101 N.Y. at 209, 4 N.E. 264; *see also Exxon Co. v. Sofec, Inc.,* 517 U.S. 830, 839–40, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) ("Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well."). Damages for breach of contract must be "such only as actually follow or may follow from the breach of the contract." *Wakeman,* 101 N.Y. at 209, 4 N.E. 264.

Moreover, damages "may be so remote as not to be directly traceable to the breach, or they may be the result of *other intervening causes,* and then they cannot be allowed." *Id.* (emphasis added); *see also Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) (stating, in considering "[l]oss of future profits as damages for breach of contract," that damages "must be . . . directly traceable to the breach, not remote or the result of other intervening causes" (citing *Wakeman,* 101 N.Y. 205, 4 N.E. 264)); *DuPont Flooring Sys. v. Discovery Zone, Inc.,* 2004 WL 1574629, at 5–6, 2004 U.S. Dist. LEXIS 13149, at *15–*16 (S.D.N.Y. July 14, 2004) (applying *Kenford* to claim for "damages for the destruction of business resulting from a contractual breach").

In arguing for damages arising from NMS's collapse, plaintiffs make three related claims: (1) the district court should not have considered *sua sponte* the issue of intervening cause because it was an affirmative defense which Sterling waived by failing to plead; (2) assuming *arguendo* that the court properly considered the issue of intervening cause, the evidence was insufficient to show that it was Goldberg who caused NMS's demise; and (3) the court should have used one of the three "reliable" methods for calculating the value of the Company that plaintiffs presented at trial. We address each argument in turn.

## I. *Waiver*

Fed.R.Civ.P. 8 governs general pleading rules. Rule 8(c) provides that a defendant, "[i]n pleading to a preceding pleading, . . . shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense." Fed. R.Civ.P. 8(c) (listing as examples, "accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver"). Generally, "a failure to plead an affirmative defense results in a waiver." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1580 (2d Cir.1994).

According to Fed.R.Civ.P. 15(b), "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." If an affirmative defense is neither pled nor tried with the parties' consent, the defense is usually waived. *See Luria Bros. & Co. v. Alliance Assurance Co.,* 780 F.2d 1082, 1089 (2d Cir. 1986).

NMS relies on the principles embodied in Rules 8(c) and 15(b) to persuade us that the issue of intervening cause in this case was an affirmative defense that Sterling waived by failing to plead it. As a result, NMS contends, the district court erred in considering *sua sponte* whether Goldberg's failure to hand over the USSB Check to Sterling constituted an intervening cause of NMS's demise. Moreover, NMS argues that the court's ruling was prejudicial because, had the issue been raised earlier, it would have offered additional testimony showing that its complete collapse occurred on November 5, 1998, the day its payroll checks began to bounce and the day before Goldberg received the USSB Check.

We are not persuaded, however, by NMS's procedural claim. Because a plaintiff may recover only for damages that are "direct[ly] and proximate[ly]" caused by a defendant's breach of contract, causation is an element—and a crucial one—of the plaintiff's *prima facie* case. *Wakeman,* 101 N.Y. at 209, 4 N.E. 264; *accord Kenford,* 67 N.Y.2d at 261, 502

N.Y.S.2d 131, 493 N.E.2d 234. Accordingly, in order to prevail, NMS had to show that the bank's breach of the duty of good faith and fair dealing directly and proximately caused the Company's collapse.

The impact of Goldberg's act of November 6, the "intervening cause," which the district court found had broken the causal link between Sterling's breach and the complained-of damages, was an integral part of the proximate cause analysis. Seen in context, the intervening cause was not an affirmative defense that Sterling had to plead. *Cf., e.g., Fed. Deposit Ins. Corp. v. Haines,* 3 F.Supp.2d 155, 166 (D.Conn.1997) (finding, under Connecticut law, that the "defense of 'intervening causes,' that is causation, [was] necessarily an element of the plaintiff's case in chief" because it was "so plainly put into issue by being embraced by the existing pleadings" and thus was not a Rule 8(c) "affirmative defense"); *Resolution Trust Corp. v. KPMG Peat Marwick,* 845 F.Supp. 621, 622, 625 (N.D.Ill.1994) (finding a defense that claims were barred by "causation in fact, proximate cause, intervening cause" was "not an affirmative defense" but merely "an assertion that [plaintiff] cannot prove a necessary element of its claim"); *E.I. du Pont de Nemours & Co. v. McCain,* 414 F.2d 369, 374 (5th Cir.1969) ("'The theory of new and independent cause is not an affirmative defense; it is but an element to be considered by the jury in determining the existence or nonexistence of proximate cause.'" (quoting *Dallas Ry. & Terminal Co. v. Bailey,* 151 Tex. 359, 367, 250 S.W.2d 379 (1952))).

*Luria Bros. & Co. v. Alliance Assurance Co.,* 780 F.2d 1082 (2d Cir.1986), does not change our analysis. In *Luria,* this Court reversed a district court's decision that plaintiff had to pay restitution for a gratuitous payment because "the questions of rescission and restitution were not even mentioned, let alone discussed below" and defendant had not sought restitution at trial. *Id.* at 1089. Although evidence of the payment was introduced at trial, this Court held as follows: "That such evidence, relevant to both pled and unpled issues, was introduced without objection does not imply consent to trial of the unpled issues, absent some obvious attempt to raise them." *Id.* However, *Luria* is inapposite to the facts before us. Indeed, the question of proximate cause, encompassing as it does Goldberg's so-called "intervening cause," was part of plaintiffs' *prima facie* case. Having alleged in their pleadings that Sterling's breach caused NMS to go out of business, plaintiffs necessarily consented to the included issue of Goldberg's intervening cause.

Nor does the statement in *Haven Associates v. Donro Realty Corp.,* 121 A.D.2d 504, 503 N.Y.S.2d 826, 830 (2d Dep't 1986), that "[i]t was [plaintiff's] burden to show that [defendant's] breach contributed in a substantial measure to its damages, whereupon the burden shifted to [defendant] to prove that some intervening cause, such as [ ] economic recession ..., contributed to the damages," persuade us to the contrary. *See also Special Prods. Mfg. v. Douglass,* 169 A.D.2d 891, 564 N.Y.S.2d 615, 617 (3d Dep't 1991) (same). In *Haven,* the plaintiff had already established proximate causation, and the court therefore shifted to the defendant the burden of proving the extent to which economic recession, rather than defendant's breach, had contributed to plaintiff's loss of future profits. *Haven,* 503 N.Y.S.2d at 829–30. Here, in contrast, no such burden-shifting occurred; NMS never proved proximate causation.

We thus hold that the district court committed no error in considering whether Goldberg's failure to hand over the USSB Check to Sterling, rather than Sterling's breach, was the direct and proximate cause of NMS's collapse. Quite the con-

trary, the district court's analysis would have been incomplete without addressing the issue.

## II. *Sufficiency of the Evidence*

NMS next argues that there was insufficient evidence to show that Goldberg's actions, rather than Sterling's breach, caused NMS to go out of business. This contention is meritless.

 We review a district court's factual findings for clear error. Fed. R.Civ.P. 52(a). We will not reverse "simply because [we are] convinced that [we] would have decided the case differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Nor may we "second-guess either the trial court's credibility assessments or its choice between permissible competing inferences." *Ceraso v. Motiva Enters., LLC,* 326 F.3d 303, 316 (2d Cir. 2003).

 In holding that Goldberg's failure to deliver the USSB Check to Sterling was an intervening cause of NMS's demise, the district court made two pivotal factual findings. First, it found that, "[h]ad [Goldberg] immediately contacted Mr. Officina and brought him the USSB check, there is no doubt that [Sterling] would have funded plaintiffs' account in an amount sufficient to cover the payroll, and that plaintiffs could have issued appropriate instructions regarding resubmission of checks that had already bounced." *Nat'l Mkt. Share,* 99 Civ. 4455, at 20 (footnote omitted).

Second, the court found that, "had the USSB check been given to [Sterling] when it was received by plaintiffs on November 6, 1998, not only could the November 4, 1998 payroll have been covered, but plaintiffs' loan balance would have been substantially reduced, and—with the serious cost-cutting plans (including the closing of call centers) Mr. Stoloff was ready to implement immediately after Election Day— the plaintiffs, in all likelihood, would have survived." *Id.* at 21.

NMS challenges both factual findings. As to the first, NMS "dispute[s][its] validity ... because it was based upon the testimony of Officina, a witness who was not credible." However, we are not in a position to "second-guess ... the trial court's credibility assessments." *Ceraso,* 326 F.3d at 316. When asked, "What would you have done ... if you had gotten that check?", Officina clearly testified that "[he] would have funded $750,000."

According to NMS, the second finding— that if Sterling had resumed its funding, NMS, "in all likelihood, would have survived"—was "[n]ot only ... purely speculative and unsupported by any evidence, but [also] totally contradicted by the competent, objective documentary and testimonial evidence." Specifically, plaintiffs contend that NMS was irreparably "destroyed" on November 5, the day *before* Goldberg received the USSB Check.

In support of this claim, plaintiffs cite the testimony of Alan Cooper, the Director of Field Operations at NMS and an eyewitness to what transpired in Iowa on November 5 as a consequence of the bounced checks. Cooper described the employees' displeasure: "[P]eople were complaining that the checks ... weren't being honored in Des Moines or in Urbandale, ... and they were pissed about it. They were really upset about it." He testified that "[o]ne guy ... had the cops with him," and "the policeman asked us, you know, 'are you going to take care of this gentleman?'" In Springfield, Illinois, Cooper reported that "a rock and a garbage can were thrown through our site." Pennsylvania was allegedly "bad," and Cooper thought that "the police shut it down on that day, because [of] the threats of vandalism."

Plaintiffs also invoke the opinion testimony of Cooper and Goldberg to prove that the Company was destroyed on November 5. Cooper, for instance, testified that NMS was "done" as of that date and that "[w]e ruined our reputation.... [W]e [could] never make another phone call in the city, because no one [was] going to work for us." Likewise, in explaining why he did not deposit the USSB Check with Sterling, Goldberg testified that "[Sterling] destroyed my business before I got the check, and I was angry, and I was upset." Although there is no such evidence in the record, Goldberg also testified that "[m]illions of dollars worth of equipment was either stolen or destroyed." Moreover, plaintiffs cite the testimony of Charles Peebler III, the head of an advertising agency interested in acquiring NMS. According to Peebler, Goldberg told him on the morning of November 6 that, "[o]nce the payroll checks were not honored, [NMS] was, in essence, out of business." Stoloff likewise testified that Goldberg had informed him that the Company was "dead" on November 5.

Based on the foregoing testimony, plaintiffs argue that "no reasonable trier of fact would have concluded that the damages inflicted upon the plaintiffs as a result of the bounced checks could have been erased if the USSB Check had been tendered upon receipt."

Plaintiffs have failed to meet their heavy burden in challenging the sufficiency of the evidence. There is sufficient evidence for the district court to have concluded that: (1) NMS was still potentially viable on November 5 despite the bounced checks; and (2) Goldberg's deposit of the USSB Check with Sterling bank on November 6 would have restored NMS to its condition before Sterling's breach. Significantly, there was evidence that NMS continued to function beyond November 5. For instance, Stoloff testified that NMS did not

close until November 12 and that some employees continued working until then. Stoloff also testified that, from November 9 until November 12, he (and Goldberg) continued to negotiate with Sterling for additional funding. At a meeting on November 10, for example, both Goldberg and Stoloff presented a downsizing plan to Officina in the hope that Sterling would continue to fund the payroll.

Nor does the evidence presented by plaintiffs compel the conclusion that NMS was destroyed as of November 5. Cooper's testimony about the reactions of a handful of NMS employees does not establish that NMS was irredeemably out of business on November 5. Additionally, the district court could rationally have assigned little or no weight to the opinion testimony of Goldberg and Cooper (who continued to work for Goldberg at the time of trial) that NMS was "dead" or "done" as of November 5. *See Anderson*, 470 U.S. at 577, 105 S.Ct. 1504 (stating that a reviewing court must give "due regard to the ability of the District Court to interpret and discern the credibility of oral testimony").

In fact, common sense weighs strongly in favor of the district court's findings. It is certainly rational to conclude that, had funding been resumed on November 6, NMS could have appeased its employees and directed them to redeposit their checks. *See Nat'l Mkt. Share*, 99 Civ. 4455, at 20. Although the inferences drawn in a case such as this, involving the future profitability of a financially unstable business, are inevitably speculative, the district court's conclusion that Sterling's continued funding would have neutralized NMS's damages is at least a plausible view of the evidence. As such, the district court's finding was not clearly erroneous. *Metzen v. United States*, 19 F.3d 795, 798 (2d Cir.1994) (" 'Where there are two permissible views of the evidence, the factfin-

der's choice between them cannot be clearly erroneous.'" (quoting *Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504)).

### III. *Damages*

Finally, we reject NMS's claim that the district court erred in holding that their damages were too speculative to calculate and that its award of $1 was plain error.

Having held that Sterling was not liable for NMS's total demise, the district court then considered whether plaintiffs could recover for damages incurred during the twenty-four hour period between Sterling's breach and Goldberg's subsequent act. However, the district court held that "[t]he damages that occurred on November 5 and 6, 1998, [were] 'so uncertain,' that they, too, [could ]not be recovered." *Nat'l Mkt. Share,* 99 Civ. 4455, at 21 (internal citation omitted).

Rather than challenging the district court's holding that potential damages incurred prior to Goldberg's acts of November 6 were "so uncertain," however, plaintiffs argue that "the District Court erroneously concluded that [they] only sustained damages as a result of Sterling's bad faith for a period of approximately 24 hours ... because": (a) the court "should not have entertained the affirmative defense of intervening cause in the first instance"; and (b) "there was no evidence that turnover of the USSB Check could have saved the Company." In doing so, plaintiffs simply reiterate the arguments already rejected above. Indeed, each of the methods proposed by plaintiffs for calculating their damages is based on the premise that Sterling caused NMS to go completely out of business. Because we hold that the district court correctly considered the impact of Goldberg's failure to tender the USSB Check to Sterling and committed no error in finding that this failure proximately caused NMS's collapse, plaintiffs'

claim that they are entitled to damages for the total value of the Company is futile.

Finally, because plaintiffs have failed properly to challenge the court's holding that potential damages incurred during the 24–hour period prior to Goldberg's act of November 6 were too "uncertain" to calculate, we see no reason to consider the issue. *Cf. Tolbert v. Queens College,* 242 F.3d 58, 75–76 (2d Cir.2001) ("A contention is not sufficiently presented for appeal if it is conclusorily asserted only in a footnote.").

### CONCLUSION

The judgment of the district court is hereby AFFIRMED.